## Garrett, Appellant, *v.* Philadelphia Lawn Mower Company.

*Corporations—By-laws—Agreement among subscribers to stock.*

1. Where five persons meet for the purpose of organizing a corporation, and at the meeting they subscribe for the respective shares of their stock, and agree that one of the by-laws of the proposed company shall provide that the subscriber shall not sell or assign his stock until he shall have offered it to the other subscribing stockholders, and thereafter the company is organized and the by-laws adopted, such a by-law constitutes an agreement among the subscribing stockholders, and is enforceable against each of them, or if dead, against their personal representatives.

2. A subscription by a number of persons to the stock of a corporation to be thereafter formed by them constitutes: First, a contract between the subscribers themselves to become stockholders when the corporation is formed upon the conditions expressed in the agreement, and

as such it is binding and irrevocable from the date of the subscription; second, it is in the nature of a continuing offer to the proposed corporation which, upon acceptance by it, becomes as to each subscriber a contract between him and the corporation.

Fitzsimmons v. Lindsay, 205 Pa. 79, and Lindsay's Estate, 210 Pa. 224, followed.

Argued Oct. 13, 1908.   Appeal, No. 231, Oct. T., 1907, by plaintiff, from decree of C. P. No. 4, Phila. Co., Sept. T., 1906, No. 5,155, dismissing bill in equity in case of J. Lentz Garrett v. The Philadelphia Lawn Mower Company, John W. Graham and Alexander B. Geary, Executor of the last Will and Testament of William G. Vernon, deceased.   Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.   Affirmed.

Bill in equity for an injunction.
The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree dismissing the bill.

*Frank R. Shattuck,* with him *O. B. Dickinson,* for appellant.—
The by-laws of a corporation cannot legally prohibit or limit the right of a stockholder to sell his stock: Bloede Co. v. Bloede, 84 Md. 129 (34 Atl. Repr. 1127); McNulta v. Corn Belt Bank, 164 Ill. 427 (45 N. E. Repr. 954); Ireland v. Milling Co., 21 R. I. 9 (41 Atl. Repr. 258); Moore v. Bank of Commerce, 52 Mo. 377; In Re Klaus, 67 Wis. 401 (29 N. W. Repr. 582); Brinkerhoff-Farris Trust, etc., Co. v. Lumber Co., 118 Mo. 447 (24 S. W. Repr. 129); Feckheimer v. Nat. Exchange Bank, 79 Va. 90.

*Hampton L. Carson,* for appellee.—The by-law is valid and reasonable: Fitzsimmons v. Lindsay, 205 Pa. 79; Lindsay's Est., 210 Pa. 244; Boswell v. Buhl, 213 Pa. 450; Barrett v. King, 181 Mass. 476 (63 N. E. Repr. 934); Dupee v. Boston Water Power Co., 114 Mass. 37; Scruggs v. Cotterill, 67 App. Div. 583.

OPINION BY HEAD, J., April 12, 1909:
The material facts in this case, all of which appear in the bill

and answer or have been agreed upon by the parties and stated by the court below, are briefly these.   On November 7, 1893, five gentlemen met in the city of Philadelphia to take the preliminary steps towards organizing a private corporation to take over the business and assets of a partnership doing business under the firm name of Graham, Emlen & Passmore.   Among these gentlemen was Wm. G. Vernon.   These five were to be all of the incorporators of the proposed company and at that meeting subscriptions to the stock were made by each of them. At the same meeting the chair was authorized to appoint a committee of two to prepare proposed by-laws for their future conduct and submit them at a subsequent meeting.  ·The chair appointed the said Wm. G. Vernon and John W. Graham, one of the defendants.   A second meeting was held on the twenty-first of the same month, at which all of the same gentlemen, the incorporators, were present.   The committee appointed to prepare a set of by-laws submitted its work, and it was moved and unanimously carried "that the above by-laws be adopted as the laws of the association."   At the same meeting the application for a charter, which had been prepared by counsel, was submitted and was thereupon executed.   Among the regulations thus submitted and adopted at the meeting of these individuals, prior even to the execution of the application for a charter, was the following: "Shares of capital stock may be transferred by indorsement on the certificate and its surrender to the secretary for cancellation, whereupon a new certificate shall be issued to the transferree.   Provided, however, that before any one holding stock of this corporation at the time of the adoption of these by-laws shall sell or assign such stock so held by him, he shall offer the same to the then stockholders who shall have the option of buying the same at par, and only upon the declination of the stockholders to buy said stock shall he have the right to sell to outside parties."   Subsequently, on December 19, 1893, letters patent were regularly issued and the said corporation was duly created under the laws of the state of Pennsylvania.

The record does not disclose any· change of ownership in the stock or any controversy of any kind among the stock-

holders, as to the management or control of the corporation, down until the death of Wm. G. Vernon in 1904. At the time of his death he was the owner of 187 shares of the capital stock of the corporation. Letters testamentary were issued to Alexander B. Geary, one of the defendants, who qualified as executor and undertook the duties of his trust. Some time after the decease of said Vernon, his executor offered at public sale the aforesaid shares of stock, with the privilege to the purchaser to buy one share or as many of the 187 as he might desire, for the price at which the stock would be knocked down. The plaintiff, Garrett, purchased one share of stock at said sale for $138, and sought to have a new certificate issued to him as the transferree of Wm. G. Vernon, deceased. The officers of the corporation declined to make the transfer because of the failure of the executor to first offer the shares of his testator to the remaining stockholders, in accordance with the terms of the stipulation which had been entered into by the incorporators previous to the organization of the corporation and which afterwards became a by-law of the body corporate. Following such refusal this bill was filed praying for a decree directing such transfer to be made and for an injunction to prevent and restrain the transfer of such share to any other person than the plaintiff. The learned court below in a careful opinion filed, held that the plaintiff had shown no equity and entered a decree dismissing his bill. From that decree this appeal is taken.

We do not think the exact question before us is as broad as it is stated by the able counsel for the appellant. He deals with the question largely, if not exclusively, as if we had nothing before us in the nature of individual action, by persons owning property and regulating its future disposition, but rather as if we had simply a by-law of a corporation, adopted by a majority of its stockholders, which undertook to regulate, perhaps interfere with, the ordinary rights of property of the individual stockholders of such corporation. If we were dealing merely with an ordinary by-law, we would doubtless be obliged to hold that no such law could be effective if it were unreasonable, or if it were forbidden by sound public policy. Many cases in other jurisdictions have been cited which seem to hold that a

by-law, the effect of which would be to even restrict the right of a stockholder to sell and transfer his stock, would be void. In some instances such cases stand on the statutory regulations of the states in which they were rendered, whilst in others they perhaps take the broader ground. But the decisions are not uniform even in the states outside of Pennsylvania, and certainly no case has been cited in Pennsylvania where even a by-law, of the character of the one now before us, has been held to be unreasonable or in contravention of sound public policy. On the contrary, as we shall presently show, an agreement practically similar to the one now under consideration was held to be valid and binding upon those who entered into it.

But, in our view of the case, we have something more before us than merely a by-law, adopted in the usual form by the stockholders, or a majority of them, of the corporation. There was certainly no incapacity on the part of any one of the five gentlemen, who afterwards became the incorporators of the defendant company, to agree among themselves how the corporation should be organized, and how its stock should be held and transferred, to the end that they might reasonably be able to foresee where the control and management of the corporation would rest. As long as they violated no statutory law or rule of public policy, they had the right to agree to whatever they deemed most likely mutually to subserve their future interests. At the same meeting, and as part of the same act, they subscribed for the amount of stock which, it was mutually agreed, each should take, and fixed the conditions upon which that stock should thereafter be held. There can be but little doubt as to the nature of their act in subscribing for the stock. That they thereby assumed a contractual relation towards each other, as well as towards the corporation thereafter to be created, has been frequently stated. The effect of such an act is thus described in Minneapolis Threshing Machine Co. v. Davis, 3 L. R. A. (Old Series) 796: "A subscription by a number of persons to the stock of a corporation to be thereafter formed by them constitutes: First, a contract between the subscribers themselves to become stockholders when the corporation is formed upon the conditions expressed in the agreement, and as

such it is binding and irrevocable from the date of the subscription; second, it is in the nature of a continuing offer to the proposed corporation which, upon acceptance by it, becomes as to each subscriber a contract between him and the corporation." The same principle is more tersely stated by WOODWARD, J., in Graff v. Pittsburg, etc., R. R. Co., 31 Pa. 489, in the following language: "A subscription to a joint stock is not only an undertaking to the company, but with all other subscribers. Such contracts are trilateral, and even if fraudulent as between two of the parties, they are to be enforced for the benefit of the third." By their subscriptions to the stock of the proposed corporation, the five incorporators fixed the relation in which all agreed it was desirable each should respectively stand towards the corporation and towards each other. This relation was of the first importance to the future success of their enterprise and they had a right to consider it and to contract with each other concerning it. We do not apprehend it will be denied that in this respect the relation they created at that time was contractual in its nature. But if it was proper and reasonable for them to consider what proportions of the stock each of the individual incorporators should hold, how did it become unreasonable or unlawful for them to take the further step of so guarding such holdings, that the common object in view should not thereafter be disrupted when it became necessary or desirable that the stock of one incorporator should be sold? The regulation they adopted did not prohibit the alienation of his stock by any incorporator. On the contrary, it recognized and anticipated that such sale might happen. It did not attempt to bind future holders of the stock who might never have assented to the stipulation and who might never become stockholders until after the object then in view had been accomplished. The stipulation simply undertook to bind those who were considered as stockholders at the time of its adoption, and each of those persons was present advocating and assenting to the adoption of such a regulation. Had such company been incorporated by a special act of the legislature prior to the adoption of the new constitution, and had such a provision been inserted in the charter act, no one will deny that it would have been effec-

tive to accomplish its purpose. Such provisions are frequently inserted in the charters of corporations. We cannot see why, as to the five incorporators, this agreement, by which each one bound himself to sell his stock only in the manner therein provided, was not just as effective as if it had been placed in the body of their charter, because it was one of the conditions agreed to in advance of the creation of the corporation, and its effect was to continue and endure after such creation. An antenuptial agreement is not entered into by a husband and wife, but by two individuals in contemplation of the early assumption of the marriage relation. But the agreement they then make may lawfully and properly bind them and control the disposition of their property after they assume the new relation, otherwise it could not effect the object for which it was made. So here, the conditions that were to control the future transfer of their joint property—in which all were interested—were not created by stockholders, deriving their power to make by-laws because of their ownership, but by individuals, each acting for himself, and free to act as he chose for his own and the common good.

In New England Trust Co. v. Abbott, 162 Mass. 148, a leading case in that state, a question arose quite similar to the one now before us. That was a bill for the specific performance of a stipulation requiring that, in case of the death of a stockholder in a corporation, his stock should be appraised in the manner therein indicated and then first offered to the directors for the use of the corporation, etc. The by-laws of the corporation so provided, and these provisions were printed on the backs of the certificates which the stockholders agreed to receive and hold in accordance with these by-laws. In disposing of that case the court said: "The defendant contends that these by-laws are void. We have not found it necessary to consider that question and we express no opinion upon it. We think that the case may well stand on the ground that the defendant's testator entered into an agreement with the plaintiff to do what the plaintiff now seeks to compel his executor to do. It is manifest that a stockholder may make a contract with a corporation to do or not to do certain things in regard to his

stock, or to waive certain rights or to submit to certain restrictions respecting which the stockholders might have no power of compulsion over him. In Adley v. Whitstable Co., 17 Ves. Jr. 315, 322, Lord Eldon says: 'It has been frequently determined that what may well be made the subject of a contract between the different interests of a partnership would not be good as a by-law.'"

In the present case the aid of a court of equity is invoked to compel an executor to violate an agreement entered into by his testator. But it may be said that the purchaser of the stock in the Massachusetts case found the by-laws printed on the back of his certificate and therefore had knowledge of them before he bought, and consequently was bound by them. So far as the purchaser in this case, the present plaintiff, is concerned, he too had express notice of the situation that was before him, and that the corporation would not transfer the stock to him in violation of the agreement that had been made by his predecessor in title.

But it seems to us that the question has been very largely settled adversely to the plaintiff by the Supreme Court of our own state. In Fitzsimmons v. Lindsay, 205 Pa. 79, it appeared, "That the James C. Lindsay Hardware Company has a capital stock of $150,000, and that on April 13, 1895, James C. Lindsay et al. were the owners of all of its stock, and on that date these stockholders entered into an agreement for the evident purpose of continuing the concern as a close corporation, and provided therein that in the event of the death of any one or more of the parties the remaining stockholders should have the option to purchase and acquire the stock of the deceased party at its book value." On the death of one of the stockholders a bill in equity was filed in the common pleas of Allegheny county to compel a disposition of his shares of stock in accordance with that agreement. There was a demurrer filed to the bill. In disposing of that case it was held that the jurisdiction was exclusively in the orphans' court and that consequently the bill in the common pleas could not be sustained. But in considering the character of the agreement and the right of the other stockholders to have it enforced this language was used:

"Neither is the objection that the agreement is in restraint of alienation sufficient. Such agreements are quite common among partners as to their shares in the firm assets and are enforced by courts without hesitation. No reason of overruling public policy is apparent why they should not also be sustained in relation to shares of stock in what is really only a private trading corporation." In Lindsay's Estate, 210 Pa. 224, that agreement was finally enforced, and in speaking for the court Mr. Justice Brown said: "In Fitzsimmons v. Lindsay, 205 Pa. 79, we held that the agreement of the stockholders of the James C. Lindsay Hardware Company by which each subscribing stockholder acquired a preferred right by way of option to purchase the shares of any one who died or who might withdraw from the business was a binding contract supported by a mutual and sufficient consideration."

Now if Wm. G. Vernon and his associates had entered into an agreement in form and executed it with their hands and seals, the case would be on all fours with that just cited. Certainly the nature of the agreement has not changed because of the form in which the parties chose to stipulate with each other. The intention to agree, of each to bind himself, is just as apparent as if it had been clothed in the most solemn and formal of instruments. If in essence and substance the object they had in view was neither unreasonable nor opposed to public policy, it can hardly be said to become so because it was afterwards adopted as a by-law, by the corporation not then in existence, but whose future welfare was then being provided for. The learned court below has carefully analyzed and compared many cases outside of the state and cited others from other states which we think support the conclusion he has reached. We are constrained to agree with him that the plaintiff has shown no such equity as should move the court to enter the decree prayed for, and therefore the bill was properly dismissed.

Decree affirmed.