## Mather Estate.

362

Argued January 17, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Richard P. Brown, Jr.*, with him *Robert M. Baxter*, and *Morgan, Lewis & Bockius*, for appellants.

*John B. H. Carter*, with him *Frederick H. Spotts*, and *Pepper, Hamilton & Scheetz*, for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, March 21, 1963:

The Executors of the Estate of Gilbert Mather took this appeal from a decree which entered judgment on

the pleadings and ordered specific performance of a written stock option agreement. The Executors claim the agreement was invalid as *an unreasonable restraint on alienation,* because the optional purchase price was fixed at $1 per share, which was only a small fraction of the stock's actual value.

In order to decide this question a review of the relevant facts is necessary.

Prior to 1926 Mather & Co. was a partnership consisting of Charles E. Mather, his two sons Victor C. Mather and Gilbert Mather, and his daughter Josephine C. Mather. In December, 1926, the partners incorporated their insurance business under the name of "Mather & Co."

Of the 1,000 authorized shares of common stock, 800 were issued as follows: Charles E. Mather 250 shares; Victor C. Mather 250 shares; Gilbert Mather 250 shares; Josephine C. Mather 50 shares.

On December 22, 1926, the four stockholders entered into a written agreement which provided, inter alia, that if any one of the four die or desire to sell his (or her) stock during his (or her) life he (or she) would first have to offer it to the others at $50 per share.

Charles E. Mather died October 31, 1928. Victor and Gilbert exercised their respective options and bought the stock which was owned by (the executors of) Charles E. Mather for $50 per share. As a result of these purchases Victor C. Mather owned 375 shares, Gilbert Mather owned 375 shares, Josephine C. Mather owned 50 shares.

On or about January 9, 1933, 50 shares of stock held in the treasury but previously unissued, were issued to Charles E. Mather II, the son of Victor C. Mather.*

On November 6, 1939, Victor C. Mather, Gilbert Mather and Josephine C. Mather entered into a writ-

---

* The record does not disclose the purchase price.

ten agreement which provided ". . . the said contract of December 22, 1926 is hereby canceled and terminated by the unanimous consent of Victor C. Mather, Gilbert Mather and Josephine C. Mather insofar as the Fifty Shares of Common Stock of the said Mather & Co., held by the said Josephine C. Mather, is concerned, to the end that the said Josephine C. Mather may enter into an Agreement with Mather & Co. relative to and touching upon said Fifty Shares of Common Stock held by her."

On the same day, viz., November 6, 1939, Josephine C. Mather and Mather & Co. entered into a written agreement which pertinently provided: "That the said Josephine C. Mather agrees to sell and the said Mather & Co. agrees to buy said Fifty shares of Common Stock of Mather & Co., a Pennsylvania Corporation, from the personal representatives of the said Josephine C. Mather at her death at the rate of Fifty Dollars ($50.00) per share, the payment for same and the transfer of same to be consummated within thirty days of the death of Josephine C. Mather. And the said Josephine C. Mather on her part agrees not to sell said Fifty Shares of Common Stock of Mather & Co. during her lifetime to any person or corporation other than the said Mather & Co. without first obtaining from the said Mather & Co. its consent in writing to such sale and transfer."

On the same day, viz., November 6, 1939, Victor, Charles II and Gilbert entered into a written agreement which pertinently provided:

"2. That in the event of the death of Gilbert Mather, or in the event of his offering his stock for sale during his life, he, for himself, his heirs, executors and administrators, agrees to sell, and Victor C. Mather and Charles E. Mather, 2nd agree to buy, in equal propor-

tions, at One Dollar ($1.00) per share, any or all of the Common Stock holdings of the said Gilbert Mather.*

"4. That as to any or all of the above three provisions, the survivors or survivor among the class of purchasers in each case shall be entitled to the entire rights given the purchasers in each case.

"5. That in the event that any of the aforesaid stock, when for sale by the stockholder, or his estate, is not purchased by those entitled to purchase, as aforesaid, then the holder of said stock, or his personal representatives shall have the right to sell same upon the open market without restrictions.

"9. That the parties hereto further agree that the provisions of the aforesaid agreement and the rights to purchase thereunder shall accrue in each case not only as to the original holdings of each of the signatories hereto, but also to any and all additional holdings of common stock as may come into the ownership of any of the signatories hereto by operation of this agreement, or otherwise.

"10. That the parties hereto further agree not to at any time sign or hypothecate or make any effort to transfer shares of Common Stock of Mather & Co. contrary to the terms of this agreement.

"11. That the parties further agree that this agreement shall be binding upon the heirs, executors and administrators of the parties hereto . . ."

Following the death of Victor C. Mather, his executors sold and *Gilbert* and Charles II, purchased on July 16, 1943, in equal proportions at *$1.00* per share, all of the common stock of Victor, in accordance with the aforementioned agreement of November 6, 1939. After this purchase, the stock was held as follows: Gilbert

---

* There were similar provisions with respect to each of the other two signatories.

Mather 562-1/2 shares; Charles E. Mather, II 237-1/2 shares; Josephine C. Mather 50 shares.

On June 5, 1950, *Gilbert* sold 61-1/2 shares to Charles II at *$1.00* per share, making the holdings: Charles E. Mather, II 299 shares; Gilbert Mather 501 shares; Josephine C. Mather 50 shares.

Josephine C. Mather died August 12, 1953, and her 50 shares were sold to Mather & Co. at $50 per share, as per the above mentioned agreement between her and Mather & Co. dated November 6, 1939.

Following the death of Gilbert on October 23, 1959, Charles II tendered $501 to the Executors of the Estate of Gilbert Mather for the purchase of Gilbert's stock. At the time of the tender, the stock of Mather & Co. was carried on the books at $444.92,* and its actual value was not less than $1,060 per share. After the tender had been refused, Charles E. Mather II filed a petition in the Orphans' Court asking for specific performance of the aforesaid agreement of November 6, 1939.

It is well settled that a summary judgment either on the pleadings or after preliminary objections will be entered only in a case which is clear and free from doubt: *Schrader v. Heath,* 408 Pa. 79, 83, 182 A. 2d 696; *Robinson v. Philadelphia,* 400 Pa. 80, 82, 161 A. 2d 1; *Vrabel v. Scholler,* 369 Pa. 235, 85 A. 2d 858, 860; *London v. Kingsley,* 368 Pa. 109, 81 A. 2d 870; *Waldman v. Shoemaker,* 367 Pa. 587, 589, 80 A. 2d 776.

In order to determine the meaning of the agreement, we must examine the entire contract since it is well settled that in construing a contract the intention of

---

* The record does not disclose the book or actual value of the stock on other dates except as follows: As of December 22, 1926, the book value and the actual value of the stock is unknown; as of November 6, 1939, the book value of the stock was zero while the actual value was not less than $50 per share.

the parties governs and that intention must be ascertained from the entire instrument taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter. *Betterman v. American Stores Co.*, 367 Pa. 193, 80 A. 2d 66; *Waldman v. Shoemaker*, 367 Pa. 587, 589, 80 A. 2d 776; *Scholler Trust*, 403 Pa. 97, 169 A. 2d 554; *Wolters Estate*, 359 Pa. 520, 59 A. 2d 147. Cf. also *Walton Estate*, 409 Pa. 225, 231, 186 A. 2d 32; *Althouse Estate*, 404 Pa. 412, 416, 172 A. 2d 146.

In addition to the hereinabove recited provisions, this agreement provided: "Whereas: The parties, *for their mutual benefit,** desire to perpetuate the business of Mather & Co., and the ownership of the Common Stock thereof in the Mather family."* *

When the family changed the form of the family business from a partnership to a corporation their language and intent was crystal clear—they wanted and intended to keep the stock of Mather & Co. in the Mather family if any Mather wanted it; and to carry out this intent they gave the options, rights and obligations so clearly and specifically set forth in the aforesaid agreements.

The Court, in *Bechtold v. Coleman Realty Co.*, 367 Pa. 208, 214-215, 79 A. 2d 661, pertinently said: ". . . 'By-laws constitute in effect a contract between the different members and the corporation' . . . a by-law [which] required the corporation to repurchase a stockholder's shares upon his death or removal from the vicinity was held to be immune from repeal. And see Constructors Association of Western Pennsylvania v. Seeds, 142 Pa. Superior Ct. 59, 15 A. 2d 467 (1940), holding a by-law of an incorporated association con-

---

* Italics throughout, ours.

stitutes an agreement between the association and its members and is subject to the same rules of construction as a written contract signed by all parties.

"There remains but to be said that by-laws restricting the transfer of stock as here have been recognized in this State as serving a useful purpose, lawful and enforcible: Garvin's Estate, 335 Pa. 542, 6 A. 2d 976 (1939); Fitzsimmons v. Lindsay, 205 Pa. 79, 54 A. 488 (1903); Garrett v. Philadelphia Lawn Mower Co., 39 Pa. Superior Ct. 78 (1909)."

In *Garrett v. Philadelphia Lawn Mower Company,* supra, the Court said (page 86): " 'Neither is the objection that the agreement is in restraint of alienation sufficient. Such agreements are quite common among partners as to their shares in the firm assets and are enforced by courts without hesitation. No reason of overruling public policy is apparent why they should not also be sustained in relation to shares of stock in what is really only a private trading corporation.' In Lindsay's Estate, 210 Pa. 224, that agreement was finally enforced, and in speaking for the court Mr. Justice Brown said: 'In Fitzsimmons v. Lindsay, 205 Pa. 79, we held that the agreement of the stockholders of the James C. Lindsay Hardware Company by which each subscribing stockholder acquired a preferred right by way of option to purchase the shares of any one who died or who might withdraw from the business was a binding contract supported by a mutual and sufficient consideration.' "

The aforesaid written agreements, including the one in suit, were made between mature members of a close family and it is conceded that there was no overreaching or fraud or deceit. The facts and the lawfulness of the purpose were admitted by appellants. However, appellants argue that the agreement was *an invalid restraint on alienation* because the price was

clearly very *unfair* and *unchangeable*. The contention that a stock option or purchase price must be flexible is unrealistic and utterly devoid of merit, even if we overlook the fact that the price was not unchangeable since in 1939 the parties entered into the present written agreement changing the price on options, purchases and sales from $50 to $1. Moreover, we repeat, the agreement clearly and expressly set forth the *intention* of all the parties—they wanted to keep the family business in the Mather family and to give each other and their personal representatives the options, rights and obligations hereinabove recited. There was a limited but not an absolute restriction on sale, since if the option was not exercised by a living signatory to the family agreement "the holder of said stock or his personal representatives shall have the right to sell same upon the open market without restrictions." In this free land of ours where even a State cannot impair the obligations of a contract, we cannot understand how it can be seriously contended that this written family agreement—and family agreements are always favored in the law—when made by adult business men without any overreaching or fraud, is "a scrap of paper".

Not only was there no overreaching or fraud but *Gilbert Mather himself* in 1950 bought from Victor Mather's executors 187-1/2 shares at $1 per share and in 1950 sold 61-1/2 shares of Mather & Co. stock at a price of one dollar a share to Charles E. Mather, II. In the light of this, it seems anomalous that Gilbert's executors contend that the agreement was valid for Gilbert, but invalid for Charles.*

Appellants contend, we repeat, that this agreement is an unreasonable restraint on alienation.

---

* Apparently, what is sauce for the goose is not sauce for the gander.

The classic example of the application of "the restraint on alienation" principle is furnished by the Rule against Perpetuities. The basic underlying purpose of that Rule (which prohibited the limitation or fettering of an estate for longer than lives in being and 21 years thereafter together with the period of gestation) was to prohibit unreasonable restraints on alienation of property. Cf. *Newlin Estate,* 367 Pa. 527, 80 A. 2d 819; *Lewis Estate,* 349 Pa. 571, 573, 37 A. 2d 482; *Ledwith v. Hurst,* 284 Pa. 94, 130 A. 315; *Hale v. Scanlon,* 88 Pa. D. & C. 506.

41 Am. Jur., §6, p. 53, Perpetuities and Restraints on Alienation, states: "Purpose of Rule.—The underlying and fundamental purpose of the rule against perpetuities is founded in the public policy of preventing the fettering of the marketability of property over long periods of time by indirect restraints upon its alienation." *Barton v. Thaw,* 246 Pa. 348, 92 A. 312; *Mifflin's Appeal,* 121 Pa. 205, 15 A. 525.

A similar question was raised in *Allen v. Biltmore Tissue Corporation,* 2 N.Y. 2d 534 (Court of Appeals of New York, April 4, 1957), 141 N.E. 2d 812, where the Court said: "The question posed, therefore, is whether the provision, according the corporation a right or first option to purchase the stock at the price which it originally received for it, amounts to an unreasonable restraint. In our judgment, it does not.

"The courts have almost uniformly held valid and enforcible the first option provision, in charter or by-law, whereby a shareholder desirous of selling his stock is required to afford the corporation, his fellow stockholders or both an opportunity to buy it before he is free to offer it to outsiders. See, e.g., Penthouse Properties, v. 1158 Fifth Ave., supra, 256 App. Div. 685, 11 N.Y.S. 2d 417; Hassel v. Pohle, 214 App. Div. 654, 212

N.Y.S. 561; Cowles v. Cowles Realty Co., 201 App. Div. 460, 194 N.Y.S. 546; Palmer v. Chamberlin, 5 Cir., 191 F. 2d 532, 27 A.L.R. 2d 416; Doss v. Yingling, 95 Ind. App. 494, 172 N.E. 801; Baumohl v. Goldstein, 95 N.J. Eq. 597, 124 A. 118; see, also, 8 Fletcher, op. cit., §4205, p. 787. The courts have often said that this first option provision is 'in the nature of a contract' between the corporation and its stockholders and, as such, binding upon them. Hassel v. Pohle, supra, 214 App. Div. 654, 658, 212 N.Y.S. 561, 565; see, also 8 Fletcher, op. cit., §4194, p. 736. In Doss v. Yingling, supra, 95 Ind. App. 494, 172 N.E. 801 a leading case on the subject and one frequently cited throughout the country, a by-law provision against transfer by any stockholder—there were three—of any shares until they had first been offered for sale to other stockholders at *book value*, was sustained as reasonable and valid, 95 Ind. App. at page 500, 172 N.E. at page 803: 'The weight of authority is to the effect that a corporate by-law which requires the owner of the stock to give the other stockholders of the corporation . . . *an option to purchase the same at an agreed price or the then-existing book value before offering the stock for sale to an outsider, is a valid and reasonable restriction and binding upon the stockholders.*' "

Another familiar example of the application of the restraint on alienation principle, is an attempted fettering of an absolute gift or grant of a fee, by a restraint on alienation or sale. *Cannistra Estate*, 384 Pa. 605, 121 A. 2d 157; *Sowers Estate*, 383 Pa. 566, 119 A. 2d 60; *Stineman v. Stineman*, 382 Pa. 153, 114 A. 2d 137; *Grossman v. Hill*, 384 Pa. 590, 595, 122 A. 2d 69.* More recently the principle has been applied, on Constitutional grounds, to restraints on alienation to per-

---

* And numerous cases cited in footnote 2 on page 595. *Grossman v. Hill* was overruled on a procedural point.

sons except those of the Caucasian race. *Shelley v. Kraemer*, 334 U.S. 1; *Barrows v. Jackson*, 346 U.S. 249.

*Lauderbaugh v. Williams*, 409 Pa. 351, 186 A. 2d 39, relied upon by appellants, is clearly distinguishable on its facts, and to extend "the restraint on alienation" principle to a case like this, would be worse than a "Procrustean stretch."

To summarize: We find no merit in appellants' contention that where there is no overreaching or fraud, the great difference between the sale price and the actual value of the stock is sufficient, alone or with the aforesaid additional facts, to invalidate the agreement or defeat specific performance.

Decree affirmed, costs to be paid by appellants.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority here fails to recognize, and hence does not discuss, the manner in which this agreement differs from the usual first option agreement. Here, the agreement creates an absolute restraint against transfers and provides for a first refusal price which is unconscionably nominal in relation to the value of the shares *at the time the arrangement was made.* I would hold where an agreement entered into at a time when the actual value of the stock is $50 or more a share, which agreement prohibits the sale of shares by any party during his lifetime without first offering the same to the other shareholders at a price of $1 per share, that the imposition of this nominal and unvariable pre-emption price creates an unreasonable restraint upon the alienability of the shares and imposes an invalid restriction on their transfer. See Sparks, Future Interests, 32 N.Y.U. Law Rev. 1434 (1957); Baker and Cary, Cases and Materials on Corporations, 322-26 (3rd ed. 1958).

The fact that the parties have entered into the agreement of their own free will cannot validate provisions which are void as against public policy; nor does the fact that there was no overreaching or that Gilbert Mather himself bought shares at $1 per share from Victor Mather's executors legalize an unreasonable restraint on alienation.

I dissent.