Beggy, Appellant, *v.* Deike.

Argued April 25, 1963. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and ROBERTS, JJ.

reargument refused December 30,
1963.

*Ella Graubart*, with her *Charles F. C. Arensberg*,
and *Patterson, Crawford, Arensberg & Dunn*, for ap-
pellant.

*John C. Bane, Jr.*, with him *Gilbert J. Helwig*,
*Ernest R. Dell, Charles L. Albright, Jr.*, and *Reed,
Smith, Shaw & McClay*, for appellees.

OPINION BY MR. JUSTICE ROBERTS, November 12,
1963:

Appellant, by complaint in equity, seeks to rescind
certain sales of stock to officers and majority stock-
holders of a corporation rather than to the corporation
itself as required by the terms of a restrictive agree-
ment. The decree of the court below dismissed appel-
lant's complaint; hence, this appeal.

Appellant began his employment with Mine Safety
Appliances Company (MSA) as an office boy at age
15, and thirty years later, at his separation from the
company in May, 1948, occupied the position of vice
president, secretary and treasurer. From 1931 until
April, 1950, he served also as a director of the corpo-
ration. On August 2, 1948, appellant and MSA exe-

cuted a written agreement which recited that appellant, as owner of 12,860 shares of common and 3,215 shares of preferred stock, was required to grant MSA the first opportunity to purchase any stock he should wish to sell, and that if MSA failed to exercise its right to purchase within thirty-five days, appellant was free to sell the shares to any purchaser.[1]

At all times since the organization of MSA in 1917, the Deike and Ryan families, together, have been the largest and majority owners of the capital stock of the company. In 1955 and 1956, defendants George H. Deike, Sr., and John T. Ryan, Jr., were chairman of the board and president of MSA, respectively. The other defendants, George H. Deike, Jr., and Helen D. Henderson, are the son and daughter of the chairman of the board, and Mary Irene Ryan is the wife of the president.

In March, 1955,[2] appellant desired to sell some of his common stock and requested his attorney to contact MSA. This information was communicated to George H. Deike, Sr., chairman of the board, who informally related to the board appellant's offer to sell

---

[1] The agreement provided, inter alia, ". . . the undersigned John F. Beggy . . . covenants and agrees with the Company, that in the event I desire or intend to sell any or all of said shares of capital stock, the Company shall have the first right or privilege for the period of 35 days after receiving a written notice or notices from me . . . of my intention to sell any or all of said shares, to purchase such number of said shares set forth in said written notice or notices, at the price offered by any *bona fide* intended purchaser or purchasers . . . .

"In the event the Company should not exercise its said right and privilege to purchase on or before the expiration of said 35 days after receiving said written notice and/or notices, then said John F. Beggy shall have the right to sell the shares so offered to the company to any other purchaser or purchasers."

[2] Beggy was then owner of 8,265 shares of common and 2,065 shares of preferred stock. The balance of his stock had been held under subscription rights which he was unable to exercise.

852 shares. The directors indicated to Deike that the company was not interested in acquiring the stock. However, neither appellant nor his attorney was so advised. Deike, on March 8, 1955, confirmed to appellant's counsel, by letter signed "Geo. H. Deike, *Chairman of the Board*," willingness to purchase 850 shares at the offered price per share, with instructions to deliver properly endorsed stock certificates to the Potter Bank for a check in full payment.[3] Appellant delivered 852 shares to the bank and received the bank treasurer's check for $11,076. The stock was not acquired by the corporation, but by. Deike and Ryan individually. As found by the chancellor, the identities of the purchasers ". . . may not have been known at the time to the plaintiff . . . ." Four hundred twenty-six shares were transferred to Ryan's wife and 213 shares each to Deike's son and daughter.

Approximately 13 months later, in April, 1956, appellant desired to sell an additional 894 shares of common stock, and he once more asked his attorney to contact MSA. The Board of MSA was advised that appellant offered to sell, but the corporation again indicated to Deike that it had no interest in making the purchase. However, Mr. Deike fixed the price at $15 per share and directed that the certificates be delivered to the Potter Bank where a check in full payment would be ready. Appellant delivered the cer-

---

[3] The letter read in pertinent part: "Confirming our telephone conversation . . . as to the possible sale of 1000 shares ... ., a price of $13.00 per share was offered by me. . . . When this stock is ready for delivery have it properly endorsed and have it delivered to . . . [the President of Potter Bank], who will turn over a check in the amount of $11,050. in full payment of 850 shares Common Stock of the Mine Safety Appliances Company at $13.00 per share.

Very truly yours,
Geo. H. Deike
*Chairman of the Board*"
(Italics in the original.)

tificates to the bank and received the bank treasurer's check for the purchase price. Again neither appellant nor his attorney was informed that MSA was not acquiring the stock but that Deike and Ryan were each individually purchasing 447 shares.

In February, 1957, MSA itself purchased appellant's remaining 6,519 shares of common stock at $50 per share, but in April, appellant brought suit against the company in federal court to rescind that sale, charging violations of the Federal Securities and Exchange Act. During trial, the litigation was settled. However, in January, 1958, at the federal pre-trial proceeding, appellant's counsel learned for the first time that the stock offered to MSA in 1955 and 1956 under the first refusal provision of the restrictive agreement was purchased not by the corporation but by the chairman of the board and the president of the company for themselves and their families.

Prior to and throughout the period of the negotiations for the 1955 and 1956 sales, MSA's wholly owned subsidiary, Callery Chemical Company, had been engaged in research dealing with the element boron, a component of high-energy fuel. As a result of negotiations with the Navy, it received a Letter of Intent from the Navy Department dated June 6, 1952, for the planning and construction of a plant for the production of boron. The minutes of the Callery Board meeting of January 26, 1955, disclosed that: "As reported at the last meeting, we were asked to attend a meeting in Washington, D.C., to discuss the future planning of financing facilities and the production of our product. As a result of this meeting, we have submitted to the Navy Department the complete planning report covering our anticipated requirements, and this report is currently being reviewed and studied by Navy personnel."[4] Current information on the progress of

---

[4] At a Board meeting of MSA held on the same day, the following resolution was adopted: "That the proper officers of the

the negotiations was given to the Board of Callery at various succeeding meetings.[5] Callery's continued research, submission of proposals to and negotiations with the Navy culminated in a "Cost-Time Facilities Contract" with the Navy dated June 26, 1956, for the construction of a $38,000,000 plant at Muskogee, Oklahoma, for the production of boron.

In order to obtain the Navy contract, MSA was required to and did guarantee the performance of the contract. In addition, it was obliged to secure participation of a suitable associate for completion of the program. For this purpose, negotiations with Gulf Oil Corporation were initiated early in 1956 and concluded in a contract dated February 6, 1957. Under the agreed participation, Gulf purchased 50% of the capital stock of Callery for $2,400,000.

While both Deike and Ryan were personally carrying on these negotiations at or about the time the stock purchases from appellant were made, and some information was relayed to the Boards of MSA and Callery, as previously indicated, neither Beggy nor other outside stockholders could have been informed about these activities, since they were of a highly confidential nature, disclosure of which was forbidden by the federal government. Upon disclosure of the contract both by the company and the government in late June, 1956,

---

Company be and hereby they are authorized to purchase $10 Par Value Common Capital Stock of the Company within the monetary limitations of the existing loan agreements, at a price not to exceed $14.00 per share, plus commissions."

[5] Board minutes record: On January 18, 1956, an announcement to the Board of Callery of the preparation of a bid proposal to be submitted to the Navy Department; March 1, 1956, that the bid proposal was being finalized; April 6, 1956, contact with Gulf Oil Corp. as a possible associate in the project; April 18, 1956, announcement of the submission of the bid to the Navy Department; June 5, 1956, guarantee on part of parent company forwarded to the Navy.

the price of "over-the-counter" sales of MSA common stock began to rise steeply, and in 1958, small lots of the stock were sold at a price higher than $300 per share.[6]

In June, 1958, after five months of negotiations for the return of the shares, the present equitable proceeding was brought to rescind the 1955 and 1956 sales of stock. The chancellor concluded that the purchasers of the stock were under no legal or fiduciary obliga-

---

[6] The following are excerpts from a press release of April 2, 1957, which Ryan sent to the shareholders of MSA, announcing that a joint program had been undertaken by the company and Gulf Oil Corporation for the production of high energy boron compound and that ground had been broken at Muskogee, Oklahoma, for the $38,000,000 fuel plant under contract with the Navy:

"Mine Safety Appliances Company and Gulf Oil Corporation have undertaken a joint program for research and production in the field of boron chemistry, including high energy fuels.

. . .

"The high energy fuel to be produced at this plant is called 'HiCal', a mixture of boron, hydrogen and carbon. It is expected to power jet aircraft and missiles to new peaks of efficiency and performance. This plant is part of the Navy's closely guarded 'Project Zip'.

"Rear Admiral C. S. Cooper, deputy and assistant chief of the Navy's Bureau of Aeronautics, described the 'HiCal' plant as the initial step in a venture 'which might some day be as far reaching in its effect as was the discovery of oil.'

"Based on the chemical firm's research with boron compounds, the Navy in 1952 awarded Callery a contract to develop these compounds as high energy fuels for aircraft and missile applications. The plant now under construction on a 1300-acre site at Muskogee will permit production of the fuel in tonnage quantities.

"Although characteristics of the 'zip' fuel are a military secret, the Navy revealed it will multiply the range of a jet aircraft or missile and permit flying at altitudes substantially higher than any aircraft can reach today without rocket power.

" 'HiCal' can be used efficiently at altitudes where ordinary fuels will not burn. The additional energy it provides can extend range, reduce weight of an airframe, increase payload, or improve tactical performance such as speed and climb."

tion to disclose to appellant that his offer had been refused by the corporation and that they, in fact, were the purchasers of the stock; that it was legally immaterial whether or not appellant was aware of these facts; that the prices paid for the stock were the fair market prices; and that appellant was barred from equitable relief by his delay in bringing this suit.

It is appellant's position that he offered to sell his stock to the company, as required by the restrictive agreement of 1948, not to the individual defendants, and that the purchase by them (and subsequent transfer of stock to themselves or their families) without his knowledge or consent was a violation of his rights under the contract and a fraud upon him. Appellant contends also that Deike and Ryan, majority stockholders and top management executives, had confidential corporate information of special facts and circumstances involving secret and continuing negotiations with the Navy not available or known to him, and that in purchasing stock from him, the chairman of the board and the president of the company traded on inside confidential information and sought to profit personally on the basis of confidential knowledge acquired in their capacities of corporate fiduciaries. While it is conceded that neither Deike nor Ryan could disclose the confidential data to appellant, it is contended that they were likewise precluded from using that information for their own benefit.

Appellees vigorously contend that as majority stockholders and principal corporate officers, they owed to appellant no fiduciary obligation, and that their purchases of his stock were free from fraud, deceit or other wrongdoing and furnished no basis entitling appellant to rescind the sales. They seek to sustain this position primarily on the argument that appellant, by virtue of his years of management association with MSA, had "intimate knowledge" of the company's traditional

policy of avoiding public distribution of its stock and encouraging instead acquisition of shares by its officers, employees and "other friendly interests", and that when the company bought back its stock (in accordance with by-laws or contract provisions), the company did not retain such stock in its treasury but redistributed the purchased stock to its "own officers and employees, and others closely associated with the company in some business way." It is further contended that appellant may not prevail in this proceeding because he unduly delayed his action for rescission and, hence, is guilty of laches. In support of this result, appellees argue that had appellant made known his election to rescind the sales earlier and shortly after the award of the Muskogee contract had become known to him in 1956, appellees might have reversed the sales "at a cost of not more than $15.00 per share," whereas his attack on the validity of the sales coming in April, 1958, at a time when shares (in small lots) were being sold at prices "higher than $300.00 per share," made the cost and difficulty of any attempt to restore the status quo "insuperably great."

Basic to the present litigation is the status of the agreement of 1948 between appellant and MSA. This Court has recently reaffirmed the principle that a contract provision which requires an offer of stock first to other stockholders (or to the corporation) before sale to outsiders is valid and enforceable. *Mather Estate*, 410 Pa. 361, 189 A. 2d 586 (1963). In the *Mather* case, we upheld a decree of specific performance directing a decedent's estate to sell stock representing majority control to surviving shareholders at the price fixed in a restrictive agreement, $1 per share, a figure far below actual value at the time ($1,060 per share). The controversy in *Mather* was based on the very great disparity between the contract price and the actual value of the stock. Here, the principal dis-

pute centers on substitution of persons not named or included in the contract in place of the expressly named corporate purchaser. If MSA failed to purchase, the terms of the agreement gave only to appellant the choice of purchaser.

It is clear that *Mather* requires strict adherence to the terms of the bargain entered into by the parties. The equitable principles which there mandated that one having a contract option to purchase stock be granted the full benefit of the precise terms of the obligation to sell surely is equally available to deny to a purchaser an unfair advantage achieved by a sale contrary to the language of the contract (and to the offer to sell) without knowledge in the seller of the true nature of the transaction.

The evidence discloses that the offers of sale were made by appellant's attorney directly to MSA through its chairman of the board, George H. Deike, a personal acquaintance of the attorney. Although Mr. Deike knew that the Board had no intention of accepting appellant's offer, the "acceptance" from "Geo. H. Deike, *Chairman of the Board*"[7] failed to indicate the board's position and gave every appearance that Deike was acting for the corporation, not for himself. So also with other letters concerned with the stock sales.[8] At no time prior to 1958, therefore, did appellant know or have reason to believe that the shares, in fact, had been

---

[7] This letter is quoted in note 3, supra.

[8] A letter to appellant's attorney, dated March 10, 1955, stated: "This will acknowledge receipt of your various letters relative to our purchase of 850 shares of the Common Stock of the Mine Safety Appliances Company from John F. Beggy, and the arrangements have all been made in connection with that transaction.

"In your letter of March 9 you indicate that the balance of John's stock is for sale and in reply I wish to state that we will be interested in discussing this matter further with you.

purchased by Deike and Ryan for themselves and their families.

The identity of purchasers of stock is quite important, especially where the purchaser is a principal officer and majority stockholder in a closely held corporation who has access to information not generally available to the public or to other shareholders. See *Strong v. Repide*, 213 U.S. 419, 425 (1909) ; *Binns v. Copper Range Co.*, 335 Pa. 257, 6 A. 2d 895 (1939) ; *Imbrie v. Community Loan Co.*, 131 Pa. Superior Ct. 398, 200 Atl. 149 (1938). The market inference which logically flows from a purchase of additional shares by such a corporate officer is that something of importance may be occurring in the affairs of the company. Appellant reasonably could have concluded that if the acquisition were worthwhile to the Deike and Ryan families to the exclusion of others, it might have been just as worthwhile for him to retain his stock. At the very least, their desire to purchase would have been a proper factor for his consideration and determination of the quantity and price of shares to be sold. He was entitled to this information, par-

---

"We are willing to give consideration to the immediate purchase of the balance of the Common Stock with an option or agreement as to the future purchase of the preferred stock. . . .

. . .

Sincerely yours,
George H. Deike"

A subsequent letter, dated April 22, 1955, stated in part: "We were interested in the information which you gave to us that John might wish to dispose of the balance of his stock, and at such time as he wishes to take up this matter again, we will be glad to hear from you.

. . .

Very sincerely yours,
Geo. H. Deike,
*Chairman of the Board*"
(Italics in the original.)

ticularly since he was not disposing of his entire holding.[9]

The court below concluded, as appellees strongly argue here, that in view of appellant's long and intimate relationship with MSA, he knew of the custom of the company to make distributions of stock to its officers, friends and employees. Appellees contend that knowledge of this policy made immaterial the actual identity of the purchasers, since appellant should have known that the corporation itself would retain none of the stock. The simple answer to such contention is that custom could not supplant the express terms of the written agreement entered into with knowledge of the custom. Moreover, careful examination of the record reveals that the custom and policy, knowledge of which appellees attribute to appellant and upon which the former base their case, was not followed in these transactions.

Although the policy of MSA was to distribute stock purchased under restrictive agreements to key employees, officers, etc., no such distribution was here made. As stated in the brief for appellees: "The members of the Deike and Ryan families have usually shared in these distributions, among other things, no doubt, in order to preserve their positions as majority stockholders," and "The plans of distribution were settled, and the distribution prices fixed, by the directors of the Company, and were always so formulated as to preserve, by at least narrow margins, the majority positions of the Deike and Ryan families, considered as a group . . . ." Further, in a 1954 transaction, where stock was purchased directly by one of the Deikes from

---

[9] That the securities market considers the identity of a purchaser as significant and important in determining price of stock is clearly and convincingly established by this record. Upon disclosure of Gulf's purchase of Callery stock from MSA, the price of MSA stock advanced to more than $300 per share.

the estate of a late shareholder pursuant to a restrictive agreement, the purchaser did not retain the shares for himself or his family, but immediately redistributed the stock more broadly, as was the custom. Here, the stock was taken entirely by the Deike and Ryan families. Thus, even assuming, as contended by appellees, that knowledge and expectation of compliance with the corporation's distribution policy would have made immaterial the identity of the actual purchasers of appellant's stock, the failure to comply with that policy renders totally ineffective the argument based upon it.

Nor can appellees effectively contend that appellant has suffered no damage because he received the fair market price for his shares. What they term "fair market price" was based only upon knowledge then available to the public. However, when the confidential information previously in possession of Deike and Ryan was released to the public, the market price of shares in MSA rose sharply. The price that appellees contend was fair on the market was not fair as between appellant and appellees under these circumstances.

Viewed realistically, the undisputed factual situation is simply this: MSA did not exercise the first refusal option granted it by the contract. Instead, appellees, without disclosure to appellant and without his knowledge, consent or acquiescence, availed themselves of a contractual option not granted to them. This result neither MSA nor appellees could, by their own conduct or unilateral action, legally or equitably impose upon appellant.

The remaining argument posed by appellees is that appellant's long delay after the award of the Muskogee contract in June, 1956, and after consummation of the negotiations with Gulf convicts him of laches. To the contrary, in 1956, appellant had no reason to suspect

that he had been dealt with not in accord with the terms of the agreement. The stock sales by him in 1955 and 1956 were, to his knowledge, to the corporation pursuant to its express terms. The 1957 sale of shares by appellant directly to MSA, subsequently attacked in the district court on federal grounds, was in exact compliance with the contract. It was not until January, 1958, at pre-trial proceedings in the federal action, that appellant discovered the identity of the purchasers of his stock and that neither the terms of the contract nor of his offer to sell had been observed in 1955 and 1956. Only at that time was appellant aware of the facts giving rise to the cause of action presently before us; only then did he have reason to seek rescission of those sales. Suit was begun in June, 1958, after negotiations for the return of the stock had failed. The additional delay of five months was not unreasonable under the circumstances.

Restoration of the status quo ante does not appear to be as "insuperably great" as appellees urge. Although they purchased the stock at a fraction of its later worth, the increase in value is a paper figure as to them, since it does not appear that they have disposed of any of the shares. Indeed, the structure of the corporation and appellees' family control indicate that they have retained the shares. None of the elements of laches, see *Thompson v. Curwensville Water Co.,* 400 Pa. 380, 162 A. 2d 198 (1960), are here present.

We conclude that rescission should have been granted.

Decree reversed and remanded for the entry of an appropriate decree not inconsistent with this opinion. Costs to be paid by appellees.

Mr. Justice O'BRIEN took no part in the consideration or decision of this case.