**Moyer Estate**

J. *Lawrence Grim, Jr.,* for accountant.
*Catherine R. Barone,* for Commonwealth.

SATTERTHWAITE, P. J., September 20, 1973.— The first and final account of Bucks County Bank and Trust Company, executor of the estate of said decedent, was presented to the court for audit, confirmation and distribution of ascertained balances on March 5, 1973, as advertised according to law. Said audit was duly continued in open court to April 2, 1973. Due proof of appropriate notice thereof to all parties legally interested in said estate appears in the record.

Said account has been examined and audited by the court. Balances for distribution shown thereby include principal in the amount of $58,635.55, composed of shares of a farmers' cooperative carried at $1,100 and cash of $57,535.55; and income in the amount of $4,381.02 in cash. Said respective balances for distribution appear to have been correctly computed and stated on the accounting filed.

No additional receipts since the accounting were suggested. Accountant requested and is hereby allowed additional credit against principal in the amount of $62.17 for additional counsel fees paid, and against income in the amount of $354.19 for Federal and Pennsylvania income tax paid since the closing date of the accounting. The respective balances for

distribution shown in the account are hereby reduced accordingly.

Submitted for adjudication at audit pursuant to section 1001(3) of the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373, 72 PS §2485-1001(3), was the matter of the efficacy of a buy-sell agreement between decedent and his son in the former's lifetime as establishing the valuation of decedent's real estate which was the subject thereof for inheritance tax purposes. The inheritance tax appraisal had disregarded and given no effect to this agreement, valuing the subject realty at what the appraiser claimed was the free and unencumbered value thereof as of the date of decedent's death.

The facts and background of the agreement are not in dispute. Decedent died May 2, 1971, at the age of 83, leaving a will dated October 23, 1964, whereby he had given an option to his son George S. Moyer to purchase his farm together with all the farm equipment, livestock, farm machinery, crops and feed at the fixed purchase price of $25,000, and left his residuary estate, including the proceeds of such sale, equally, among his four children (including George), all of whom, in fact, did survive him.

For some years prior to the date of this will, in fact since 1956, George had been in partnership with his father in the operation of the farm, sharing profits and losses on an equal basis. This relationship continued until April 25, 1967, when it was terminated by the execution of the written agreement between decedent and George which provides the occasion for the within question. In form, this document contained certain prefatory "whereas" clauses, reciting the relationship of the parties; the ownership of the farm and the livestock, machinery, crops, feed and the like thereon

by decedent; the fact that George had resided thereon for his entire life and presently resided thereon with his wife and five children, all of whom had helped decedent in the operation of the farm; and continuing:

"WHEREAS, the purpose of this Agreement is to enter into an estate plan for [decedent] and to secure GEORGE in the future operation and ownership of the farm."

By the operative clauses of the agreement, decedent thereby gave and transferred to George, outright and presently, all livestock, machinery, crops, feed and the like, together with certain shares of a farm cooperative. He also granted George possession of all of the farm land with the exclusive right to farm the same and to have all the crops and profit from operation of the farm. He also granted George and his family the right of joint possession and occupancy of the farm-residence jointly with himself, with George to provide all meals at a common table and to provide "help" to decedent if the latter became ill. Another clause required George to pay for all gasoline, gas, oil, electric, telephone and insurance premiums, with decedent to pay all real estate taxes on the farm. The document further recited the option provisions of decedent's will dated October 23, 1964, and stipulated that decedent would not change his will without written permission from George. Except for one final clause directing that the agreement be binding upon the executors, administrators, heirs, successors and assigns of the parties thereto, the only other provision thereof, was as follows:

"6. This Agreement shall constitute an Agreement of Sale between [decedent] as the Seller and GEORGE as the Buyer, whereby the Seller agrees to sell and the Buyer agrees to purchase the farm-residence-real

estate for the purchase price of Twenty-Five Thousand Dollars ($25,000.00), and that time of performance shall be a reasonable time after [decedent's] death."

All parties concerned have complied with the terms of this agreement, in decedent's lifetime as well as subsequent to his death. George and his family continued to reside on and to farm the subject real estate, as well as to provide board for decedent as contemplated. Following decedent's death, George carried out his contractual obligation to purchase the realty, and the proceeds of the $25,000 purchase price are included in the funds herein accounted for and to be awarded upon this audit. Accountant as executor, as well as George's three sisters, who live separate and apart from George and constitute with him the sole parties beneficially interested in the estate, have all recognized the force and binding effect of the agreement, and accountant has filed its inventory and paid inheritance tax on the basis that the real estate should be valued at the contracted price of $25,000.

The inheritance tax appraiser disagreed, however, valuing the real estate at $100,000. It is the tax on this $75,000 difference which constitutes the sole subject of the present dispute, all other taxes having admittedly been fully settled and paid. No contention is made by the Commonwealth that the fact of execution of the 1967 agreement should be arguably taxable as an equitable transfer within the contemplation of one or more of the situations covered by Article II, Subdivision C (Inter Vivos Transfers), sections 221-226, inclusive, of the Inheritance and Estate Tax Act of June 15, 1961, 72 PS §§2485-221 to 226, inclusive. Compare, e.g., Kelly Estate, 46 D. & C. 2d 21 (1968), 18 Fiduc. Rep. 501; or Stump Estate, 21 Fiduc. Rep. 264 (1971). The notice to accountant of the within inheritance tax appraisal, a copy being

attached to the petition for adjudication, merely set forth the appraised values of the reported real estate, personal property and jointly-owned property, including as the only now-disputed item the $100,000 valuation of the subject realty; the line of printed notice form for inclusion of taxable *transfers* was left blank.

Prior to 1962 there would have been little doubt about the outcome of this litigation in favor of the Commonwealth. Case law had settled that an inter vivos "buy-sell" agreement fixing the price of the property in question could not be conclusive and all-controlling upon the Commonwealth's appraisement for inheritance tax purposes, regardless of the binding effect thereof upon decedent and his estate: McLure Appeal, 347 Pa. 481 (1943). Against this background, it is evident that section 507 of the Inheritance and Estate Tax Act of June 15, 1961 was intended to change the law; compare Fiduciary Review, December 1960. The real problem presently before the court, therefore, is to construe and apply the statutory language to determine whether the legislative change extends to the situation here presented. Section 507, 72 PS §2485-507, provides in relevant part as follows:

"When a decedent's property is subject, during his lifetime and at the time of his death, to a binding option or agreement to sell, the appraised value thereof shall not exceed the amount of the established price payable therefor, provided the option or agreement is a bona fide arrangement and not a device to transfer such property for less than an adequate and full consideration in money or money's worth." [Two further sentences provide for the effect of nonperformance of the option or agreement, and are accordingly of no moment in the instant case.]

No real question arises as to the binding nature of the subject agreement, both in decedent's lifetime and

after his death. On the latter aspect, George's right to specific performance, if necessary, would seem unquestionably to have been established by Mather Estate, 410 Pa. 361 (1963), which granted such relief under a similar agreement notwithstanding a significant increase in the date-of-death value over the price stipulated in the contract. While the buy-sell clause here in question was not to be performed until after decedent's death, that is not to say that the agreement, in its entirety and including that clause, was not binding upon him during his lifetime. Without defaulting, decedent obviously was not free while he was yet alive to dispose of his title to the farm inconsistently with his unqualified commitment to require his estate to convey after his death.

The only significant problem presented by the statutory language is that contained in the proviso to section 507 that the agreement of sale be "bona fide" and not a device to transfer for less than an adequate and full consideration in money or money's worth.

This requirement quite apparently would necessitate the existence of an actual, subsisting, arms-length transaction, resulting in a contractual undertaking which was mutually regarded at the time when it was entered into, and continuously thereafter, as an effectual business arrangement, which had been arrived at upon an agreed, valuable and adequate quid pro quo in the legal sense, plus the eventual consummation of the undertaking on the contract terms. Effectuation of such an arrangement between closely related parties, as in the instant case, would not be precluded, but it must be closely scrutinized.

Considering the instant record in light of these standards, the auditing judge has come to the conclusion that the agreement in question does not satisfy the requirements of section 507, and hence that

the $25,000 purchase price therein stipulated is not all-controlling on the inheritance tax valuation of the subject real estate. Regardless of whether it be considered "a bona fide arrangement," it does under all the background and surrounding circumstances appear to be a "device to transfer such property for less than an adequate and full consideration in money or money's worth."

The agreement specifically recites as the occasion therefor, not an arms-length business transaction, but rather the effectuation of an estate plan for decedent and to "secure" the son in his future continuing enjoyment of the father's bounty. This is not a case where the son and his family had thereby agreed to tear up independent roots of their own to move onto and operate the business of decedent's farm for him and provide special and possibly difficult care for him as a dependent in his declining years; to the contrary, the son had lived on the farm all of his life and there is not the slightest inkling of any thought that he or his wife and children intended ever to remove therefrom. Moreover, the father was then, and remained until shortly before his death, in robust good health, considering his years and apparently never required special care or nursing. While the agreement conferred the privilege of farming the land upon the son and gave him all the use and benefit thereof, it did not continue the former partnership nor even obligate the son to continue to farm had he chosen to discontinue the occupation. Indeed, the son's only real undertaking required by the agreement, in addition to paying the operational costs, other than real estate taxes, of what was now his business, was to provide food at the table for his father, to provide "help" for him, but not payment of medical bills and the like, if the father became ill, and to buy the real estate at the

concededly deflated price of $25,000 upon the father's death.

The situation presented by the within record is significantly different from that shown in Way Estate, 18 Fiduc. Rep. 137 (1967), the only reported case which has considered and applied section 507. In that case a parent and child were engaged as partners in an ongoing greenhouse business and the mother's contractual undertaking to sell her interest to her son after her death for $10,000 as one aspect of their continuing partnership agreement had the objective of inducing the son to give up other interests to which he had theretofore been committed and thus to assure that he would become dedicated to the greenhouse enterprise and carry it on for the mutual benefit of mother and son during the mother's remaining lifetime. Such elements of an obligatory continuing business relationship for the advantage of both parties in Way Estate may well have constituted a substantial consideration for the mother's promise to convey at an advantageous price within the meaning of section 507, but those elements are completely lacking in the instant case. Here, the son's bare promise to board his father and "help" him in illness is not persuasively demonstrated to have constituted full or adequate consideration in money or money's worth for the father's obligation binding his estate to convey at less than actual value.

Having determined that the $25,000 price tag put upon the farm by the agreement is not dispositive of the inheritance tax valuation question under section 507, the court next must decide what the proper appraisal should be. Both sides anticipated this eventuality and presented the respective opinions of real estate experts on that subject. While they largely agreed on the significance of the physical aspects of the property and the rather equivocal nature of what

might be regarded as its potential or theoretical highest and best use, they not unexpectedly differed widely on their respective ultimate conclusions of actual value as of the time of decedent's death.

Both agreed that the property's present use as a dairy farm would probably not have been its most practical or economic adaptation if it had come on the market as of the date of decedent's death, and that it might more realistically be regarded as, in the words of the Commonwealth's appraiser, "a transitional use from agricultural to residential subdivision." By this the experts apparently meant that the premises were probably worth more than a dairy or working farmer could afford to pay for it as a theoretical purchaser in view of its potential for eventual residential subdivision development, but that, as of the valuation date, such actual development would have to await the installation of public water and sewer facilities which were an unpredictable number of years in the future.

With respect to what a theoretical investor might pay for the subject property under such speculative conditions, the respective experts relied upon substantially different allegedly comparable sales data and, accordingly, arrived at significantly different results. Accountant's witness, Edward G. Browning, in reliance apparently upon one comparable sale, that of an immediately adjacent but significantly differently zoned and situated farm, came up with an opinion of fair market value for the subject property of $74,500. The Commonwealth's witness, William Mount, purporting to take into account four or five sales of more distant but arguably more similar properties, arrived at a value of $125,000. While considerations militating to varying degrees against the comparability of the respective sales used by each witness were brought out by the other, the court believes that Browning's

opinion was on the whole less persuasive than that of Mount. The burden of proof of error in the filed appraisal from which the appeal has been taken is upon the appellant: Grossman and Smith, Pennsylvania Inheritance and Estate Tax, §1001-6, and cases therein cited. Accordingly, the auditing judge finds that this burden has not been sustained, the inheritance tax appraisal of $100,000 must be and hereby is affirmed, and accountant is hereby directed to pay the additional inheritance tax due by reason thereof.

No other unpaid claims against the estate were presented.

No other questions for adjudication were stated in the petition for adjudication, nor were any apparent to the court from the record, except to note that the court has now been advised that Larry Swartz has been appointed administrator of the estate of Mildred S. Moyer, who died after the within decedent, and the share of such distributee should accordingly be awarded to her said personal representative.

The net ascertained balances for distribution are hereby awarded as suggested by the scheme of the schedule referred to in the last paragraph of the petition for adjudication pursuant to the will of the decedent, a copy thereof attached to the petition for adjudication being incorporated herein by reference.

No schedule of distribution need be filed.

The account is hereby confirmed, and it is ordered and decreed that Bucks County Bank and Trust Company, executor as aforesaid, shall make and pay the distributions herein awarded forthwith upon the absolute confirmation hereof.

And now, September 20, 1973, the within adjudication is directed to be filed and is hereby confirmed nisi.

## MEMORANDUM AND FINAL DECREE

SATTERTHWAITE, P. J., December 13, 1973.— The executor has filed exceptions to the adjudication which have been fully briefed and argued before the court. All of such exceptions go to the disputed inheritance tax valuation of decedent's real estate and the effect thereon of the intervivos agreement between decedent and his son George Moyer dated April 25, 1967. Exceptant conceded in brief and at oral argument that the factual determinations of the auditing judge by the adjudication were correct. Its quarrel went to the inferences, conclusions and application of the law thereto.

All such questions have been fully stated, considered and answered by the auditing judge in the adjudication, and no useful purpose would be served by rehashing the same here. For the reasons set forth in the adjudication, the conclusionary arguments set forth in the exceptions are hereby severally denied, refused and overruled.

One question which would have been spelled out in the adjudication but which everyone, including the auditing judge, overlooked, was a determination of the ultimate impact of the additional inheritance tax found to be due herein, whether it should be borne by the residuary estate (given to all four of decedent's children) or by son George alone. See discussion in Fiduciary Review, December, 1973, pp. 2-3.

Upon consideration of the broad and all-inclusive language of the tax clause, Item Third, of decedent's will, and remembering that the $25,000 price for George's purchase of the farm was provided not only by the 1967 agreement but also by the provisions of the earlier 1964 will and, therefore, might reasonably be regarded even as a testamentary benefaction within the meaning of such Item Third, it is hereby deter-

mined that all of the tax attributable to the farm is properly payable out of residue.

### FINAL DECREE

And now, this December 13, 1973, the exceptions heretofore filed by Bucks County Bank and Trust Company, executor-accountant, to the adjudication of the auditing judge are hereby severally and respectively denied, refused and overruled.

The adjudication is supplemented by the addition of the following paragraph on page 9 thereof immediately following the paragraph which concludes by directing accountant to pay the additional inheritance tax therein found to be due:

"Such tax and interest or penalties thereon shall be paid out of the principal balance in accountant's hands before division thereof into distributive shares, pursuant to the direction of Item Third of decedent's will."

As so supplemented, the adjudication is hereby confirmed and approved, finally and absolutely.