260 A.2d 919.

DAVID LEVY *vs.* INDUSTRIAL NATIONAL BANK OF RHODE ISLAND, WALTER F. FARRELL, JAMES SINCLAIR AND 91065 CORPORATION.

JANUARY 13, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

438

PAOLINO, J. This action to recover a brokerage commission was heard in 1968 before a justice of the Superior Court sitting without a jury. It is before this Court on the plaintiff's appeal from a judgment entered in the Superior Court after the close of the plaintiff's case granting the defendants' motions to dismiss with prejudice under Rule 41(b)(2)[1] of the Rules of Civil Procedure of the Superior Court.

This controversy arose out of the attempted sale of a majority of the stock of The Outlet Company by defendants Industrial National Bank of Rhode Island, the late Walter F. Farrell, and James Sinclair. The bank, Farrell and Sinclair were trustees of the stock under certain trusts. The plaintiff is an attorney and registered broker in Connecticut. The 91065 Corporation, which was added as a party defendant, is the assignee of a contract to purchase the stock in question.

The evidence, which consists of plaintiff's testimony, nu-

---

[1]Rule 41 (b) (2) reads as follows:

"*On Motion of the Defendant.* On Motion of the defendant the Court may, in its discretion, dismiss any action for failure of the plaintiff to comply with these rules or any order of Court or for lack of prosecution as provided in paragraph (1) of this subdivision. After the plaintiff, in an action tried by the Court without a jury, has completed the presentation of his evidence the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The Court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the Court renders judgment on the merits against the plaintiff the Court shall make findings as provided in Rule 52 (a)."

merous letters and other documents presented by him as exhibits, and certain stipulated facts, discloses the following. In December 1957, plaintiff learned of the possibility of a sale of The Outlet Company stock. On December 4, 1957, he telephoned Farrell and asked him if he was the right person to talk to regarding a possible sale of The Outlet Company. Upon receiving an affirmative answer, he told Farrell he was approaching him as a broker who might be able to find a customer for the Outlet stock. Farrell told him he could speak for the trustees but he would have to know a great deal more about the customer before he talked about it.

On January 4, 1958, plaintiff telephoned Farrell again and presented the name of Roger L. Stevens as a possible purchaser. Farrell told him he wanted to know more about Stevens. The plaintiff then asked Farrell if the trustees had authority to sell the stock or if Probate Court approval was required. Farrell replied that the trustees had absolute power to sell. He was to call plaintiff to make arrangements to bring Stevens to Providence. In the telephone conversation, Farrell told plaintiff that he must tell Stevens " ' * * * that he will have to relieve the trustees of any obligation to pay you a brokerage commission, and he will have to do it in writing. He will have to indemnify us in writing.' "

On March 29, 1958, plaintiff again talked by telephone to Farrell who then told him that the trustees owned over 50 per cent of the Outlet stock and the asking price for all the outstanding stock would be $12,000,000. He also told plaintiff that any purchaser would have to agree in writing with the trustees as to the terms and conditions of sale. The plaintiff told Farrell that, on the basis of the trustees' freedom to sell and on "your behalf," he would again contact Stevens. Farrell again told plaintiff that he must tell Stevens " ' * * * that he must undertake to relieve us, the trustees, of any responsibility to you on the brokerage com-

mission, and if we are entering into a deal he will have to put that in writing.'" Farrell instructed plaintiff to contact Mr. Kenneth Hill of the bank's trust department relative to the transaction and bringing Stevens to Providence. On the same day plaintiff wrote Hill giving information on Stevens' background and suggesting a meeting in Providence.

On April 25, 1958, plaintiff met Stevens in New York City to discuss the transaction and told him about Farrell's condition that the buyer must relieve the trustees of paying any brokerage commission and that he would have to do so in writing. Stevens said if that was the way Farrell wanted it, he, Stevens, would have to agree to it.

On April 28, 1958, plaintiff telephoned Hill in Providence. During that conversation, Hill reiterated Farrell's earlier condition " * * * that Mr. Stevens must relieve the trustees, must see that the trustees will be under no obligation to pay me a brokerage commission * * *" and that such condition would have to be part of any written agreement between plaintiff and Stevens. Following this conversation, there was certain correspondence relative to transmittal of a letter of interest from Stevens to Hill and the furnishing by the latter of certain financial data. In a letter dated June 5, 1958, Hill sent certain financial data to Stevens and stated that, if Stevens wished to pursue the matter further, " * * * Mr. Levy will get in touch with me."

On July 8, 1958, a meeting was held in Hill's office at the bank. Present were plaintiff, Mr. Becker of the Stevens organization and Hill. The latter asked plaintiff if he was the only broker involved, and plaintiff replied "* * * I was the only one who submitted this deal on behalf of the trustees to Mr. Stevens * * *." The plaintiff then told Hill that he "* * * wanted it definitely understood that I am the only broker in this transaction who submitted it in on the sellers' behalf, the trustees, to Mr. Stevens * * *."

Hill told Becker " 'You understand, of course, that Mr. Stevens will have to pay the brokerage commission in this transaction, so that the sellers will be free of any brokerage commission, and any obligation to Mr. Levy at all, and that will have to be done in writing if we arrive at a contract.' " Becker presented certain questions which Hill suggested be put in writing and worked out through plaintiff. Becker also asked to see the real estate occupied by the store and Hill told him that plaintiff would show it to him.

The plaintiff and Stevens carried on continued discussions about the commission Stevens would have to pay plaintiff. Following a message from either Hill or Stevens, plaintiff telephoned Stevens on October 28, 1958, and learned that other brokers were claiming a commission. He was told that he should go to Providence to clear up the situation. The plaintiff protested to Stevens that this was not part of his duties as broker for the sellers, but Stevens nevertheless engaged him to clear the matter up. On October 30, 1958, plaintiff met in Providence with Hill and other representatives of the bank. He negotiated an agreement with other parties who were claiming to be entitled to a brokerage commission for allegedly having submitted the transaction to Stevens.

On November 10, 1958, Stevens and the trustees entered into an option agreement of purchase of the Outlet stock, a fact not known to plaintiff for several days after November 10, 1958. The agreement provided that Stevens was to pay plaintiff's commission. (See Appendix I.) On November 28, 1958, plaintiff and Stevens entered into a letter agreement as to a brokerage commission. The agreement provided for a payment to plaintiff of a commission of $100,-000 upon acquisition by the purchaser of 25 per cent of the Outlet stock or assets constituting 25 per cent of the book value. (See Appendix II.) Stevens exercised the option under the November 10, 1958 agreement and then as-

signed the contract to 91065 Corporation which assumed Stevens' obligation to pay plaintiff's commission.

On March 11, 1959, the trustees were restrained by a decree of the Superior Court from transferring the stock of The Outlet Company under the agreement of November 10, 1958. The action of the Superior Court was affirmed by this Court on July 21, 1959. *Sinclair* v. *Industrial National Bank,* 89 R. I. 461, 153 A.2d 547.

The plaintiff testified that, in his efforts to secure a buyer for the Outlet stock, he had relied on the representations of Farrell and Hill as to the trustees' freedom to sell the stock; that he had never been made aware that there was outstanding a loan by the Bank to a beneficiary of one of the Outlet trusts which was in part secured by Outlet stock, and that Stevens was not his principal.

Suit based on breach of the November 10, 1958 agreement was instituted against the trustees by 91065 Corporation and was settled upon payment by the trustees of $500,000 to 91065 Corporation. In addition the parties exchanged mutual releases. By stipulation filed in this action, Industrial and Farrell agreed to satisfy any judgment obtained by plaintiff against 91065 Corporation.

On January 18, 1960, plaintiff made a written demand upon Industrial and, on August 16, 1960, upon 91065 Corporation for his commission.

After plaintiff had completed the presentation of his evidence, all defendants moved for a dismissal of plaintiff's action under Rule 41(b)(2) on the ground that upon the facts and the law plaintiff had shown no right to relief.

In passing on the motions to dismiss, the trial justice stated that in making findings of fact he would view the evidence in the light most favorable to plaintiff and draw all reasonable inferences favorable to him. He then made the following findings. The Bank never engaged plaintiff to act on its behalf as a broker in any capacity. The plain-

tiff's own testimony negated any such relationship and any agreement to pay him a commission under any circumstances. The agreement between Stevens and the trustees provided not only for payment of the commission by the buyer, but also provided that Stevens would indemnify and hold harmless the trustees from any claim for a commission. The transaction contemplated between plaintiff and Stevens in the November 28, 1958 agreement never took place, because 25 per cent of the Outlet stock or assets in the amount of 25 per cent of book value were never transferred to Stevens or to his nominee or assignee. There is no evidence that the payment of $500,000 equated 25 per cent of the book value of The Outlet Company or that it bore any relationship to the amount which the buyers would have received by way of benefit, had the 25 per cent of the book value of assets or stock of the company been transferred.

With regard to the question of a breach of warranty on the part of the Bank, relative to the power of the Bank to sell The Outlet Company stock, the trial justice concluded that, since no agreement of employment was ever entered into between the Bank and the plaintiff, there was never any obligation upon which a breach of warranty could be based. He found that, throughout all the negotiations, plaintiff was acting as a broker and agent for Stevens and not for the Bank; that any fiduciary relationship which existed was between plaintiff and Stevens; and that, since the conditions set forth in the November 28, 1958 agreement did not take place, there was no obligation on the part of Stevens or 91065 Corporation to pay the commission set forth in that agreement.

After making such findings, the trial justice concluded that, on the basis of the undisputed testimony and documentary evidence, the plaintiff had not presented a claim upon which relief could be granted and, therefore, granted

the motions to dismiss, with prejudice. A judgment incorporating his decision was duly entered.

## I

The plaintiff's first contention is that a reasonable inference from the testimony and the conduct of plaintiff and trustees, as established by the testimony, is that plaintiff acted as agent for the trustees in producing a purchaser with whom they entered into a contract of sale of The Outlet Company stock. Therefore, he argues, the trial justice's determination, that as a matter of law no contractual relationship existed between plaintiff and the trustees, is erroneous.

The premise on which plaintiff bases this contention is that, in ruling on a motion to dismiss made at the close of a plaintiff's case under the provisions of Rule 41(b)(2), the trial Court must view all the evidence in the light most favorable to plaintiff and draw all inferences most favorably to him. He cites *O'Brien* v. *Westinghouse Electric Corp.*, 293 F.2d 1 (3d Cir. 1961); *Cote* v. *Arrighi*, 91 R. I. 289, 162 A.2d 797; *Spetelunas* v. *Dubuc*, 85 R. I. 200, 129 A.2d 222. The plaintiff's premise is wrong. Those cases all involved jury trials. Also, the latter two were both decided prior to the adoption of the present Rules of Civil Procedure of the Superior Court. The "Scintilla Rule" is apposite in those cases.

In the case at bar, however, we are dealing with a jury-waived case which calls for the application of a different rule. This is pointed out by Professor Kent in his recent work on Rhode Island Civil Practice:

"Involuntary Dismissal—Insufficiency of Evidence in Non-Jury Cases ·

"The prior practice of permitting the defendant to move for a nonsuit at the close of plaintiff's evidence is retained in modified form in jury cases by Rule 50(a). See §50.1 infra. The motion for involuntary

dismissal at the close of plaintiff's evidence authorized by Rule 41(b) (2) pertains only to actions tried without a jury. The defendant may make such a motion without waiving the right to offer evidence in the event the motion is denied, but the Court, as under the prior practice, is not obliged to entertain the motion at this time and may defer judgment until the close of all the evidence. Because the judge sits as trier of fact as well as of law, he is not required to view the evidence most favorably to the plaintiff, as he was under prior practice when passing upon a motion for nonsuit in a jury case. He should weigh the evidence and determine the facts. If the determination is against the plaintiff, the Court may grant the motion for involuntary dismissal, making findings as provided by Rule 52(a). Such a dismissal is with prejudice unless the Court otherwise orders. Grounds for dismissal without prejudice include circumstances indicating that other evidence might be procured or that counsel mishandled the case. To render the dismissal without prejudice in the absence of such factors would be an abuse of discretion." 1 Kent, *Rhode Island Civil Practice* § 41.6, at 333-334.

Although the trial justice chose to follow the more restrictive "Scintilla Rule" in passing on defendants' motions and based his findings on that test, he was not required to do so. He was not required to deny the 41(b)(2) motions even if the evidence, viewed in a light most favorable to plaintiff, made out a prima facie case. If, from the evidence as it stood at the close of plaintiff's case, the trial justice was convinced that the evidence preponderated against plaintiff, he was empowered under Rule 41(b)(2) to grant defendants' motions. *Rowell* v. *Kaplan,* 103 R. I. 60, 235 A.2d 91. See *Ellis* v. *Carter,* 328 F.2d 573 (9th Cir. 1964). See also *Huber* v. *American President Lines,* 240 F.2d 778 (2d Cir. 1957); *Chicago & N.W. Ry.* v. *Froehling Supply Co.,* 179 F.2d 133 (7th Cir. 1950); *Allred* v. *Sasser,* 170 F.2d 233 (7th Cir. 1948).

Since it is the duty of the trial justice under Rule

446

41(b)(2) to weigh the evidence and determine the facts, our duty on review is merely to determine whether his findings are supported by the evidence or whether in making such findings he misconceived or overlooked any material evidence. Of course, it is also our duty to determine whether, having made supportable findings, he applied the correct rule of law.

At oral argument, plaintiff acknowledged that under Rule 41(b)(2) he is not entitled to have the trial judge look at his evidence in the light most favorable to him and give him the benefit of all the reasonable inferences which flow therefrom. Nevertheless, plaintiff insists that, as a matter of law, defendant trustees are obligated to pay the $100,000 commission called for in his agreement with Stevens. In making this contention, plaintiff relies on a line of cases[2] which hold that, when a person employs the services of a broker and requires the broker to look to the other party (be he a buyer or a seller) for his compensation, there is an implied agreement that the employer will perform the contract which the broker is hired to negotiate, thus affording the broker an opportunity to obtain his commission from the other party. If the employer fails to abide by this agreement and thereby deprives the broker of the commission due him, the broker may then sue his employer — the measure of damages being the amount of the lost commission.

While we acknowledge this line of authority cited by plaintiff, it is inapposite to the facts of the case at bar. It is the trial justice's task to draw inferences from the record before him, and this court will accept such inferences if they are reasonable. We will not substitute our view for that

[2] *Woolley* v. *Bishop,* 180 F.2d 188 (10th Cir. 1950); *Eells Bros.* v. *Parsons,* 132 Iowa 543, 109 N.W. 1098; *Cavender* v. *Waddingham,* 2 Mo. App. 551; *Atkinson* v. *Pack,* 114 N. C. 597, 19 S.E. 628; *Livermore* v. *Crane,* 26 Wash. 529, 67 P. 221.

of the trial justice's, and this is so even if an equally reasonable contrary inference could have been raised. *Tefft* v. *Tefft,* 105 R. I. 496, 253 A.2d 601; *Spouting Rock Beach Ass'n* v. *Garcia,* 104 R. I. 451, 244 A.2d 871; *Glass Tite Industries, Inc.* v. *Spector Freight Systems, Inc.,* 102 R. I. 301, 230 A.2d 254. Here the trial justice recognized the legal principles referred to by plaintiff but found as a fact that defendant trustees had never engaged plaintiff to act in their behalf. The trial court declared that there was never any agreement of employment entered into between the trustees and plaintiff.

The court below also found that the evidence disclosed that plaintiff, throughout all the negotiations between the trustees and Stevens, was acting as Stevens' representative and at no time was he acting in behalf of the trustees. The bank, having been found to *not* have employed plaintiff to sell the stock, cannot be required to abide by the implied promise described in the cases relied on by plaintiff. The trial justice, in observing that there was "a complete absence of any evidence * * * that any unilateral contract was ever entered into" between the trustees on one hand and Levy on the other, described the dealings between Levy and the trustees as a matter of Levy's probing for information and "an extreme and almost amazing reluctance" by the trustees to give him any information.

We have examined the record in the instant case and find that it does support the trial justice's finding that defendant trustees never engaged the plaintiff's services. Therefore, we find no merit in this phase of plaintiff's appeal.

## II

The plaintiff's next contention is that, since 91065 Corporation received $500,000 for a release of the trustees from the obligation of the contract brought about by his efforts, it thereby became indebted to him for the commission to which he was entitled if the contract had been carried out.

As we have previously stated, 91065 Corporation brought suit against the trustees for breach of the contract for the sale of the Outlet stock. The parties arrived at a settlement in that case under which 91065 Corporation received $500,000 for damages resulting from their failure to complete the contract. In addition, the parties exchanged mutual releases. An agreement was made between the bank and Farrell's representatives to pay any judgment which plaintiff might obtain against 91065 Corporation.

The plaintiff argues that without his services there would have been no contract between Stevens and the trustees and, consequently, no contract upon which suit could have been brought; that 91065 Corporation accepted the settlement after a trial of six weeks with the full knowledge that plaintiff was claiming his brokerage commission; and that 91065 Corporation received the benefit of plaintiff's services and, by bringing the lawsuit and accepting the settlement, waived the condition for the payment of his commission and, therefore, owed him the commission. He argues further that when such a condition is waived, either expressly or by implication, the person waiving it cannot thereafter insist upon the performance of the condition. He cites numerous cases in support of his position that the settlement by the trustees operated as a waiver of the conditions in the agreement between plaintiff and Stevens and thus entitled plaintiff to a full commission, or a *pro tanto* share thereof, from 91065 Corporation.

The cases cited by plaintiff are factually distinguishable from the case at bar. Generally they involve situations where a real estate agent produces a purchaser able to buy, who is accepted by the seller, with whom he enters into a contract, but afterwards defaults and settles with the seller, with or without suit, by the payment of a sum of money as damages for his breach of the contract. Those cases hold that the agent's commission under his contract with the

seller was earned, notwithstanding it was stipulated to be paid at the time of passing title or acceptance of deed, which did not happen, because the contract of settlement substitutes payment of damages to the vendor, in the place of the purchase money stipulated in the contract of sale and purchase, which contract was brought about by the agent's services. *Dermody* v. *New Jersey Realties, Inc.*, 101 N.J.L. 334, 128 A. 265, and *Haber* v. *Goldberg*, 92 N.J.L. 367, 105 A. 874, are two examples of the cases holding such a view. In those cases the breach of the contract by the purchaser made impossible the happening of the condition on which the agent's claim depended. See also *Tarbell* v. *Bomes*, 48 R. I. 86, 135 A. 604.

The facts in the instant case are entirely different. The agreement in this case expressly negates the effect of the rulings in the cases cited by plaintiff. The plaintiff entered into a special contract with Stevens concerning the terms and conditions under which he was to receive a commission. His right to a commission did not depend upon a transfer of the Outlet stock to Stevens *by the trustees* or upon acquisition of *control* of the Outlet stock by Stevens. (See Appendix II.)

It is clear that the commission was to be paid to plaintiff by Stevens or his assignees upon the acquisition of 25 per cent of the outstanding stock of The Outlet Company or of assets constituting 25 per cent of the book value of the assets and was to be payable under no other circumstances. The contract did *not* say that Stevens was compelled to acquire such stock or such assets *from the trustees*. Therefore, the breach of the purchase agreement here by the seller and the $500,000 settlement resulting therefrom did not make impossible the happening of the event upon which Levy's commission was to be predicated. In fact, it appears from the stipulation of fact that the total Outlet stock issued and outstanding was 99,420 shares; that the

trustees held approximately 55 per cent of the stock (55,230 shares) which they were enjoined from selling; that 44,190 shares (approximately 45 per cent) were free for transfer to Stevens at any time; and that of these, 38,628 (approximately 38 per cent) were actually tendered to Stevens and could have been purchased by him or his assignees free from trust and free from injunction. Such a purchase would have satisfied the conditions in plaintiff's contract with Stevens and would have entitled him to collect his commission from Stevens or the 91065 Corporation, notwithstanding the trustees' inability to transfer the stock in accordance with their contract with Stevens.

In view of the express language of the contract between plaintiff and Stevens, plaintiff cannot base his claim against 91065 Corporation upon its failure to acquire the stock which was available to it. The contract did not compel Stevens to acquire such stock, even though it was available, but it did provide that plaintiff would be entitled to his commission if, and only if, Stevens or his assignee acquired "* * * at least 25% of the outstanding stock of The Outlet Company or assets constituting at least 25% in book value of the assets of The Outlet Company * * *." Neither Stevens nor his assignee acquired such stock or assets and, therefore, the condition precedent to plaintiff's entitlement to the commission has not been met. There is no connection between the trustees' inability to transfer the stock under their agreement with Stevens and the failure of Stevens or his assignee to acquire at least 25 per cent of the stock or assets of the Company. Under the contract with the plaintiff, neither Stevens nor 91065 Corporation are under any obligation to pay a commission to the plaintiff.

On this record, the plaintiff's argument that 91065 Corporation's receipt of $500,000 in settlement entitles him to

a *pro tanto* recovery is so lacking in merit as to require no further consideration.

Judgment affirmed.

Motion for reargument denied.

ROBERTS, C. J., did not participate.

## APPENDIX

I. The pertinent provisions of the November 10, 1958 purchase agreement is as follows:

"12. The Buyer and the Sellers each represent, warrant and agree that they have not engaged or dealt with any broker or any other person who would be entitled to any brokerage fee or commission in respect of the execution of this Agreement and/or the consummation of the transactions contemplated hereby, except that the Buyer is obligated to pay commissions to David Levy, of Hartford, Connecticut, and to Earl C. Sylvander, of Cumberland, Rhode Island, and Robert H. McLaughlin, Sigmond Rosenblatt and Rosehenta Realty Corporation, of Providence, Rhode Island, in respect of the transactions contemplated by this Agreement; the Sellers hereby agree to indemnify and hold harmless the Buyer against and in respect of any and all claims, losses, liabilities or expenses which may be asserted against the Buyer by any such broker or other person (except said David Levy, Earl C. Sylvander, Robert H. McLaughlin, Sigmond Rosenblatt and Rosehenta Realty Corporation), on the basis of any arrangements, dealings or agreements made or alleged to have been made by the Sellers; and the Buyer hereby agrees to indemnify and hold harmless the Sellers in respect of any and all claims, losses, liabilities or expenses which may be asserted against the Sellers by any such broker or other person (including said David Levy, Earl C. Sylvander, Robert H. McLaughlin, Sigmond Rosenblatt and Rosehenta Realty Corporation) on the basis of any arrangements, dealings or agreements made or alleged to have been made by the Buyer."

II. The pertinent provisions of the brokerage agreement
are as follows:

"We, the undersigned, Roger L. Stevens and Stevens
Development Corporation, jointly and severally agree
to pay you the sum of One Hundred Thousand (100,-
000) Dollars as your brokerage commission under and
pursuant to the conditions hereinafter set forth. With-
in three (3) days after we, the undersigned, Roger L.
Stevens and Stevens Development Corporation, or
either of us or the assignee, nominee or agent of the
undersigned or of either of us, acquire by purchase or
otherwise at least 25% of the outstanding stock of The
Outlet Company or assets of The Outlet Company con-
stituting at least 25% in book value of the assets of
The Outlet Company, as the case may be, we shall
pay you the said brokerage commission in the sum of
One Hundred Thousand (100,000) Dollars in the fol-
lowing manner: within the three (3) day period here-
inbefore set forth the sum of Twenty Five Thousand
(25,000) Dollars; the sum of Eighteen Thousand Seven
Hundred Fifty (18,750) Dollars at the end of one year
after date of said purchase or acquisition as above set
forth, and a like sum of Eighteen Thousand Seven
Hundred Fifty (18,750) Dollars at the end of each
year thereafter until four (4) consecutive annual pay-
ments in the sum of Eighteen Thousand Seven Hun-
dred Fifty (18,750) Dollars each, amounting to the
total sum of Seventy Five Thousand (75,000) Dollars,
shall have been fully paid and satisfied to you or your
legal representatives. Each of said payments shall be
made by a certified check or cashier's check in New
York or Hartford funds made payable to you or your
order.

"In the event that the undersigned or either of us
or the assignee, nominee or agent of the undersigned
or of either of us shall not acquire by purchase or
otherwise at least 25% of the outstanding stock of The
Outlet Company or assets constituting at least 25% in
book value of the assets of The Outlet Company, as
contemplated by the foregoing paragraph, for any
reason whatsoever (including a default by the purchaser

under an agreement for the purchase of such stock or assets), the undersigned shall not have any liability to you for brokerage commissions in respect of said transaction."

*Tillinghast, Collins & Tanner, Peter J. McGinn, John J. Partridge,* for plaintiff.

*Hinckley, Allen, Salisbury & Parsons, Guy J. Wells, Thomas D. Gidley,* (for Industrial National Bank of Rhode Island);

*Hogan & Hogan, Edward T. Hogan,* (for Executors of the Estate of Walter F. Farrell);

*Winograd, Winograd & Marcus, Allen M. Shine,* (for James Sinclair);

*Roberts & McMahon, William F. McMahon,* (for 91065 Corporation).