ESTATE of Robert MELLER

v.

ADOLF MELLER CO. et al.

No. 87–128–A.

Supreme Court of Rhode Island.

Feb. 24, 1989.

Milton Stanzler, Cerilli, McGuirl, Hustant & Bicki, James R. McGowan, Salter, McGowan, Swartz & Holden, Providence, for plaintiff.

Howard E. Walker, Hinckley, Allen, Snyder & Comen, Providence, for defendants.

OPINION

WEISBERGER, Justice.

This case comes before us on the plaintiff's appeal from a judgment entered in the Superior Court dismissing plaintiff's complaint pursuant to Rule 41(b)(2) of the Superior Court Rules of Civil Procedure and granting the defendants' counterclaim for specific performance of a stock-purchase agreement. We affirm in part and modify the judgment in part. The facts of the case insofar as pertinent to this appeal are as follows.

On August 6, 1969, Max Meller and Robert Meller each owned 375 shares of the Adolf Meller Company (the corporation). The total outstanding shares of the corporation consisted of 1,000 shares of no-par common stock. In addition to the shares held by Max Meller (Max) and Robert Meller (Robert), two sisters, Fannie Meller Shore (Fannie) and Pauline Meller Berger (Pauline), each owned 125 shares. Max and Robert were active in the management of the company. Max held the offices of president and treasurer. Robert held the offices of vice-president and secretary. All four stockholders were members of the board of directors. However, Fannie and Pauline were not active in the day-to-day management of the corporation's business. This business at all times was the manufacture of artificial gems. On August 6, 1969, Max, Robert, and the corporation entered into a stock-purchase agreement (the 1969 agreement) under which it was set forth that upon the death of either Max or Robert, the corporation would purchase the shares of the deceased stockholder for the sum of $400,000. This agreement provided that the corporation would purchase the shares out of its "surplus" as augmented by life insurance policies taken out by the corporation on the life of Max and Robert. The agreement provided that the estate of the deceased stockholder should sell to the corporation all of his shares at the agreed-upon price. The agreement was ratified by the shareholders at a special meeting held in November 1969. At 375 shares, the agreed price of redemption would be calculated at $1,066.67 per share. The trial justice found that Max was the chief operating and executive officer of the corporation.

In 1979 Max indicated to his attorney, Edwin G. Torrance, that a modification to the agreement should be considered. He believed that his shares should be valued at the sum of $1,000,000. Torrance responded that the share value as set forth in 1969 had become unfair and that this agreement should be canceled by the parties. Torrance suggested that Max should include Pauline and Fannie in any new redemption agreement. He felt that at the least their acquiescence or consent should be obtained.

On or about September of 1979, Pauline obtained counsel and accused Max and

Robert of managing the business for their own benefit through excessive salaries and other advantages. She threatened to bring suit against her two brothers. As a consequence, after considerable negotiations, the corporation redeemed Pauline's shares for the sum of $200,000. This price would be calculated at $1,600 per share. Max, Robert, and Fannie approved of this redemption.

Thereafter, Max requested that Torrance prepare a new agreement that would include all stockholders as parties, as well as the corporation and would set a redemption price of $1,725 per share. On January 7, 1981, Torrance prepared and sent to Max a draft of such an agreement (the 1981 draft). This agreement fixed the initial redemption price at $1,725 per share and included a provision for an annual reevaluation. Any two of the shareholders were empowered to fix a new price in the event of disagreement. Between January and April of 1981, Fannie's attorney called Torrance and stated that she would not sign the 1981 draft. She objected to the provision that would have allowed Max and Robert, without her consent, to change the redemption price. The agreement was not executed. On January 8 Fannie left for California to have brain surgery. She returned February 7, 1981. On March 1, 1981, Max went to the Pacific coast on a business trip. On March 15, Robert and his wife, Harriette, left for a vacation trip to Mexico. Robert became sick on the flight and after arrival in Mexico was transferred to a hospital in Albuquerque, New Mexico, where he died on April 23, 1981. On May 22, 1981, the corporation received the proceeds from the life insurance policy that had been taken out on Robert's life. The net proceeds (after deducting loans) amounted to $271,375.78. By a letter dated May 29, 1981, the corporation advised Harriette that it was ready, willing, and able to perform the 1969 agreement and demanded that she transfer her shares to the corporation for the agreed sum of $400,000. Harriette declined and said that she considered the agreement as having been rescinded. The contentions by Harriette were twofold. She claimed that

the parties, Max, Robert, Fannie, and the corporation, had entered into an oral agreement for the redemption of the shareholders' stock at the sum of $1,725 per share. She took the position that this oral agreement was subject only to formalization. Her second position was that the 1969 agreement had become inequitable inasmuch as the value of the shares had now grown from $1,066.67 per share to $1,725 per share by agreement of the parties. The trial justice specifically found in his oral decision from the bench that there was no oral agreement and that the 1969 agreement was still in full force and effect at the time of Robert's death. The trial justice also found that at the time of its execution the 1969 agreement was not the result of overreaching or any unfairness, in that it had been entered into by two mature and experienced businessmen. The trial justice did find that at the time of Robert's death the stock of the corporation was worth approximately $1,500 per share. He based this finding upon statements made by Max, who was, as the trial justice found, completely familiar with the workings of the corporation and its business dealings.

On November 4, 1981, Harriette, in her capacity as executrix of the estate of Robert, filed a five count complaint in the Superior Court. On November 19, 1982, Harriette moved for partial summary judgment. The defendants had brought a counterclaim for specific performance of the 1969 agreement. Harriette had joined in that claim, save in regard to price, and sought partial summary judgment that would have required the corporation to pay $400,000 for the shares of stock. She would then transfer the shares of stock to the corporation, but the case would continue in order to determine the actual value of the shares either under the oral agreement or under a fair-market price to be determined. The motion for partial summary judgment was denied on the ground that there were issues of fact to be determined. The case came on for trial on February 3, 1986.

After completion of plaintiff's case, she rested and defendants moved to dismiss

her complaint pursuant to Rule 41(b)(2). The trial justice, after a thorough review of the evidence, granted the motion to dismiss. Thereafter, the court considered defendants' counterclaim, and by written decision filed on August 29, 1986, he granted defendants' motion for entry of judgment and ordered specific performance of the stock-redemption agreement to be carried out within thirty days of the date of judgment. The trial justice did not authorize the payment of any interest and required that the stock be transferred to the corporation for the sum of $400,000. The plaintiff raises several issues in support of her appeal. We shall consider those issues in the order in which they have been raised in plaintiff's brief.

## I

## DID THE TRIAL JUSTICE ERR IN FINDING THAT THE PARTIES HAD NOT REACHED AN ORAL AGREEMENT?

The trial justice unequivocally found as a fact that the parties did not enter into an oral agreement changing the stock-redemption price. After an exhaustive review of the evidence, he concluded:

"The plaintiff's position in this case, that the three remaining stockholders had an oral agreement that ought to be honored, has not been sustained by the evidence."

"As to the defendant, Fannie Meller Shore, the evidence weighs in her favor and the court finds that she neither signed exhibit 13 [the 1981 agreement] nor orally agreed to its terms. As to the defendant [Max] Meller, the court is unable to say that the evidence meets even the fair preponderance standard, let alone the clear and convincing standard. Consequently, the court finds that the plaintiff has failed to prove that an oral agreement existed between its decedent and the defendant Meller, and as controlling stockholders, with the defendant corporation, that the corporation would purchase the shares of each of them at death for the price of $1,725 a share."

In ruling upon a motion to dismiss pursuant to Rule 41(b)(2), the trial justice performs a function identical to that which he would perform in a nonjury case wherein both the plaintiff and the defendant have completed their cases. He must weigh and consider the evidence, pass upon the credibility of the witnesses, and engage in the drawing of inferences. He is not required to view the evidence in the light most favorable to the non-moving party. *Town of Charlestown v. Beattie,* 422 A.2d 1250 (R.I.1980); *Emerson Radio of New England, Inc. v. DeMambro,* 112 R.I. 300, 308 A.2d 834 (1973); *Levy v. Industrial National Bank,* 106 R.I. 437, 260 A.2d 919 (1970).

When a trial justice grants a motion to dismiss under Rule 41(b)(2) on the ground that the plaintiff has failed to establish a right to relief, it is the function of this court to review the factual findings and determinations of the trial justice in accordance with a deferential standard. This standard requires that we review the evidence to determine whether his findings are supported by the evidence or whether in making such findings he misconceived or overlooked any material evidence. *See, e.g., Samuel Nardone & Co. v. Bianchi,* 524 A.2d 1114 (R.I.1987); *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189 (R.I.1984); *J.K. Social Club v. J.K. Realty Corp.,* 448 A.2d 130 (R.I.1982); *Levy v. Industrial National Bank,* 106 R.I. 437, 260 A.2d 919 (1970). We have reviewed the evidence on this point and conclude that the evidence overwhelmingly supported the trial justice's finding that no oral agreement had been entered into by the parties.

## II

## FIDUCIARY OBLIGATIONS

The trial justice found that the parties as shareholders in a closely held family corporation may well have had a fiduciary duty to deal fairly with one another. However, the trial justice, in considering the holdings of several relevant cases, including *Helms v. Duckworth,* 249 F.2d 482 (D.C.Cir.1957) (procurement of stockre-

demption agreement by fraud); *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505 (1975) (self-dealing in favor of controlling group of shareholders); and *In re Application of Topper*, 107 Misc.2d 25, 433 N.Y.S. 2d 359 (1980) (freeze-out of minority shareholder from employment with the company), found as a fact and held as a matter of law that no breach of any fiduciary relationship had taken place. The trial justice found that unlike the situation in the *Donahue* case, Robert was one of the majority stockholders. He had in no circumstances been the victim of any over-reaching or self-dealing by Max. At the time of the execution of the 1969 agreement, there was no evidence of any deception, fraud, or failure to disclose relevant information. Both Robert and Max were mature businessmen and entered into an agreement that they considered to be in their best interests at the time. The trial justice found that there had been no abandonment nor rescission of that agreement. We believe that his findings are supported by the overwhelming weight of the evidence and that he applied the appropriate rule of law.

In a recent case we have held that the value of a shareholder's stock in a closely held corporation is irrelevant when there has been a clear and unambiguous agreement for the redemption of the shareholder's interest. *Greenwald v. Selya & Iannuccillo, Inc.*, 491 A.2d 988 (R.I.1985). In that case we held that in view of a specific agreement for redemption of a deceased shareholder's interest, it was not error for the Superior Court to deny requests for discovery and examination of the corporation's business records on the ground that they were irrelevant. This case clearly indicates that when an agreement for the redemption of the stock interest has been entered into without fraud, misleading, or overreaching, that agreement will prevail and there is no equitable duty on the part of the other shareholders to revise, update, or change the redemption price in the absence of an agreement to do so. Consequently, in holding that there was no breach of any fiduciary duty owed to Robert, the trial justice not only made the correct findings of fact but also applied the correct rule of law. *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189 (R.I. 1984).

## III

### THE COUNTERCLAIM

■ The trial justice in a written decision granted defendants' motion for entry of judgment on their counterclaim and held that the 1969 agreement should be specifically enforced. The plaintiff argues that the judgment of specific performance was erroneously entered by reason of the fact that the 1969 agreement had become clearly inequitable due to the change in value of the stock. The plaintiff would contend that the draft agreement setting the price of $1,725 per share and the finding by the trial justice that the stock was worth $1,500 per share, supports this claim of inequitability. The plaintiff further argues that our own case of *Egan v. Wirth*, 26 R.I. 363, 58 A. 987 (1904), supports this position. In that case the testator had provided that the assets of the business should be paid for on the basis of the value of the assets as they "then appear upon the books of the firm." However, it was admitted by the parties that the book value of the assets at the time of distribution was maintained at an artificially low level in order to minimize their value when included in the inventory submitted to the Probate Court of Massachusetts. Consequently, the court required that the true value of those assets be determined. Thus, as the trial justice held, the *Egan* case stands only for the proposition that when the measure of the value of assets is book value and that book value has been maintained at an artificially low level for a purpose not anticipated by a testator, then the true value must be ascertained.

The trial justice relied upon two cases, *In re Estate of Mather*, 410 Pa. 361, 189 A.2d 586 (1963), and *Peters v. Wallach*, 366 Mass. 622, 321 N.E.2d 806, 810 (1975). In *Mather* the Supreme Court of Pennsylvania granted specific performance of an agreement to redeem stock at $1 per share

although the actual value of the shares was stipulated to be $1,060 per share. In passing upon the enforceability of the contract, the court observed,

> "We find no merit in appellants' contention that where there is no overreaching or fraud, the great difference between the sale price and the actual value of the stock is sufficient, alone or with * * * additional facts, to invalidate the agreement or defeat specific performance." 410 Pa. at 372, 189 A.2d at 592.

In *Peters* the court observed that specific performance would not be refused merely because the price is inadequate or excessive, absent a showing of fraud, mistake, or concealment in the nature of fraud. 366 Mass. at 628, 321 N.E.2d at 810.

As our holding in *Greenwald* suggests, we do not second-guess the parties concerning the adequacy or inadequacy of the consideration they have named in an unequivocal or unambiguous stock-redemption agreement. There are many motivations for entering into a stock-redemption agreement. Among these motivations may be the desire that a business should continue without being forced to pay out insupportable sums of money upon the death of a key shareholder, whether majority or minority. The desire to give adequate consideration to a deceased shareholder or partner may be only one of the motivations that the parties had in mind at the time of the execution of their agreement. It is not the function of the court to rewrite a contract according to its notions of fairness. We believe that the trial justice was correct in granting the motion for entry of judgment of specific performance.

## IV

### THE INTEREST ISSUE

■ The plaintiff asserts that the trial justice was in error in failing to grant any interest upon the required payment of $400,000, representing the amount of the agreed stock-redemption purchase sum. We agree. Apparently the trial justice denied any award of interest on the ground that plaintiff by her action had prevented the transfer of funds. This finding is in part correct, but it overlooks one salient fact.

On November 19, 1982, plaintiff moved for partial summary judgment. The defendants had counterclaimed for specific performance of the 1969 agreement, and plaintiff joined in that claim, except in regard to the price. At that time plaintiff sought the judgment of the court to require defendants to pay over $400,000, which she was clearly entitled to receive. She would then have transferred the stock to the corporation and allowed the remainder of the consideration to be determined in the course of trial. It is true that the court denied the motion for summary judgment and defendants refused to accept the voluntary transfer without a release of all other claims that plaintiff may have had against them. Nevertheless, it was clearly an offer made by plaintiff to transfer the shares of stock for the agreed-upon consideration subject to a later determination by the court that she might be entitled to a greater consideration. Consequently, unlike the situation upon which defendants rely in *Paola v. Commercial Union Assurance Companies*, 490 A.2d 498 (R.I.1985), plaintiff did not by her own act prevent the stock transfer or the payment of the amount that was agreed upon as the minimum to which she was entitled, from and after the date of November 19, 1982. We are of the opinion that from and after that date plaintiff was entitled to statutory interest upon the $400,000 to which she was clearly entitled and which she did not receive until after the entry of final judgment in the case. Nothing that we set forth in *Paola* was designed to prevent a party from seeking at least a partial acceptance of an amount that is conceded to be due by way of minimizing damages. Such an offer by a party will not preclude such party's entitlement to ultimate interest on that amount if it is found to have been due.

## V

### THE ETHICAL ISSUE

■ Neither party has fully briefed the ethical issue but each party refers to cer-

tain memoranda that were previously filed before the trial justice. We specifically disapprove of counsel's raising a point based on memoranda filed in the trial court unless that point is fully set forth and elucidated in the brief filed in this court. We believe that it is not inappropriate for us to expect, and indeed to demand that the briefs before us will contain all the arguments that the parties wish us to consider and not to inform ourselves by seeking out memoranda that may have been filed before another tribunal.

■■■ We presume from somewhat obscure references that plaintiff objects to the firm of Hinckley, Allen, Snyder & Comen having represented defendants in this case as a result of the provisions of the Code of Professional Responsibility D.R. 5–101(B) and D.R. 5–102(A). Both of these provisions prohibit a lawyer from accepting employment in contemplated or pending litigation if he knows he will be, or it is obvious that he or a lawyer in his firm ought to be, called as a witness, except

"(1) If the testimony will relate solely to an uncontested matter. (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony. (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client. (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." D.R. 5–101(B).

We can only say that the record is insufficiently developed and briefed in order for us to make a determination concerning whether the exceptions might apply in this case. Certainly Edwin Torrance was a witness in the case, and his testimony related to more than a mere formality. It does appear, however, that his testimony was relatively uncontradicted. Nevertheless, our information on this point is inadequate to determine whether a violation of the ethical standard has taken place.

We held in *Judge v. Janicki*, 118 R.I. 378, 374 A.2d 547 (1977), that it was incumbent upon all members of the bar to guard against possible infractions of D.R. 5–101(B) and D.R. 5–102(A). We urged trial judges to insist upon compliance with the disciplinary rules. In the case at bar we cannot say that the trial justice committed prejudicial error in failing to disqualify the firm of Hinckley, Allen, Snyder & Comen from representing defendants. In any event we perceive no disadvantage to plaintiff in this case. Torrance's testimony was probably generally favorable to plaintiff, and we can conceive on this record of no prejudice that inured to plaintiff as a result of this representation.

In any event we are of the opinion that a party to litigation may not be the appropriate party to have standing to enforce the disciplinary rules. We have a disciplinary counsel and a disciplinary board to whom that function has been given. We believe that, as in *Judge v. Janicki*, a sanction to be applied for a violation of a disciplinary rule is probably not the sanction of granting a new trial, without a strong showing of prejudice to the party who makes the claim. *See Board of Education of New York City v. Nyquist*, 590 F.2d 1241 (2d Cir.1979), for an exposition of this rationale.

For the reasons stated, the plaintiff's appeal is denied in part and sustained in part. The judgment of the Superior Court is affirmed in respect to the dismissal of the plaintiff's complaint and the granting of judgment for specific performance. However, the judgment is modified by requiring that interest from and after November 19, 1982, to the time of payment of the sum of $400,000 be added to the plaintiff's award as consideration for specific performance of the stock-purchase agreement. The papers in the case may be remanded to the Superior Court for further proceedings consistent with this opinion.