DECISION
This is an appeal of a District Court eviction action. The plaintiff no longer seeks possession of the premises from the tenant so the remaining issues focus on the amount of back rent and other damages due. The tenant has counterclaimed alleging that the landlord committed fraud and breached his own agreements. The issues were tried de novo in a jury-waived proceeding before this Court.
 FINDING OF FACT
In August, 2005, the parties entered into a written agreement (Exhibit 1) wherein Mr. Chabot agreed to lease the premises at 113 Fordson Avenue, Cranston, to Mr. Tucker. In the agreement he drafted for Mr. Tucker's tenancy, Mr. Chabot does not represent that he is an owner, but references himself as the lessor. This lease agreement also contains an "Option to Purchase." Essentially, each month Mr. Tucker was to pay $1500 to lease the house and "shall deposit $1500 to secure the exclusive right from Lessor to an Option to Purchase. . . ." The purchase price or other terms of the purchase were not firmly set forth and the option would need to be exercised by August 30, 2006. *Page 2 
Most curiously, Mr. Chabot was not the owner of the property when the agreement was signed. He did not represent himself as the owner. Rather, Mr. Chabot acquired rights to the property in 2004 by entering into a "Lease Agreement and Option to Purchase" with the owner, Mr. Pashos. Mr. Chabot testified that he was in the business of leasing over 40 distressed properties from owners who were having difficulty meeting the financial obligations of the properties. Mr. Chabot would re-lease these properties to new occupants in anticipation of acquiring title to the property and possibly reselling them to the tenants at a profit. He attempted to delay foreclosures by dealing with the lenders. Hence, Mr. Chabot served as lessee and lessor of many of the properties, effectively subleasing the properties. Mr. Chabot prepared the leases and options, including the documents by which he received an interest in the Fordson Avenue property from Mr. Pashos, and the agreements Mr. Pashos used to `sublease' the property to Mr. Tucker.[1]
Within months, Mr. Tucker had fallen behind in his payments. Mr. Chabot commenced eviction proceedings, which were contested. Mr. Chabot appealed the District Court judgment to this Court. After a hearing, the parties came to a short-lived accord. One of the issues at that hearing was whether the purchase-option payments could be credited to the lease payments due.
In March 2006, Mr. Tucker was two months behind in his lease payments. After another accord, Mr. Tucker paid Mr. Chabot $9000. At trial, Mr. Chabot insisted that Mr. Tucker had failed to make lease payments since September 2006, as the funds received were all credited to option payments due. Neither side introduced a complete *Page 3 
accounting of funds paid. However, from the uncontroverted testimony at hearing, the Court finds that Mr. Tucker paid $18,000 in option payments from the period of September 1, 2005 through August 1, 2006.
Even after the dates set forth in the written lease passed, Mr. Tucker continued to occupy the premises as a holdover tenant. Pursuant to the terms of the lease, rent was due at $1500 per month. Neither party wrote to the other to end the holdover tenancy, as set forth in the lease. Mr. Tucker failed to pay any rent after August 2006. Mr. Chabot claims an interest in the property up to and including September 2007, until the time of a foreclosure. There was no other evidence as to when his interests as sublessor would end, so the Court finds he was the sublessor up to and ending on September 30, 2007.
Mr. Tucker is an intelligent man. He prides himself on being a knowledgeable, educated businessman and the president of his company.[2] He approached Mr. Chabot expressing an interest in purchasing the property but was unable to buy immediately because of prior tax debts. Mr. Tucker knew that Mr. Chabot was not the owner. Mr. Tucker claimed he signed the agreement before reading it, but he reviewed the document several days thereafter. He claimed that he then telephoned Mr. Chabot to question some of the terms of the document, but never memorialized his concerns or communications to writing. The Court finds that Mr. Tucker did not object to the terms of the document and by his failure to do so, and by his signature, he assented to the contract.
A revised agreement was promulgated by Mr. Chabot in September 2005. (Exhibit B) Mr. Tucker acknowledges that he received it, but never signed or returned the document to Mr. Chabot. Mr. Tucker asks the Court to hold Mr. Chabot to some of *Page 4 
the new terms. Mr. Tucker acknowledges that he never exercised his option to purchase the premises.[3] Nevertheless, he continued to occupy the premises and worked with Mr. Pashos after Mr. Chabot's option to purchase the property from Mr. Pashos expired in April 2007.
Mr. Tucker alleges that he should be credited with the costs of some improvements he made to the premises. He repainted several rooms, installed new carpeting, apparently without any prior approval from Mr. Chabot. Mr. Tucker alleges that Mr. Chabot would have seen these improvements during their negotiations of March 2007.
In October of 2005, Mr. Chabot sent a plumber to the premises and replaced the boiler. Mr. Tucker continued to complain that the sump pump would turn on continuously, and Mr. Chabot refused to repair the defect. Without permission, Mr. Tucker then dug a new well to resolve the drain problem, and re-landscaped the yard. He seeks a credit for the expenses he incurred.
 ANALYSIS
Through this action, Mr. Chabot alleges that Mr. Tucker continues to owe him $9000 for lease payments in arrears since February 2007. Mr. Tucker alleges (via his loosely worded answer and counterclaim) that Mr. Chabot breached the lease/option agreement, committed fraud and breached his obligation of good faith. He seeks $8500 in compensatory damages and punitive damages. *Page 5 
Lease payments due
By the clear language of the written lease, Mr. Tucker owed Mr. Chabot $1500 per month for leasing the home. He paid up to and including the month of August in 2006. He owes for all months afterward. The lease expressly provided Mr. Chabot with the right to collect rent during the holdover and neither party wrote to end the subleasehold. Mr. Chabot was entitled to collect rent up to September 30, 2007, the end of his leasehold, and is therefore owed 13 months of rent for a total of $19,500.
Breach of agreement by Chabot
Mr. Tucker submitted a loosely worded answer-counterclaim at the District Court level. Attempting to reconstruct the counterclaim here, the Court finds three potential causes of action listed: Breach of contract, fraud and breach of the covenant of good faith. Mr. Tucker never referenced any other claim.
At trial, Mr. Tucker was vague as to how Mr. Chabot breached the agreement. While, at this point, he is quick to criticize Mr. Chabot's field of employment, he fails to specifically reference Mr. Chabot's breach. Throughout the entire relationship, Mr. Tucker continued to occupy the property. The property was never uninhabitable. While Mr. Tucker made improvements to the property, those improvements were never authorized or agreed upon; Mr. Tucker admits he never exercised his option to purchase the property so Mr. Chabot's failure to convey the property to him was not a breach.
The second agreement signed by Mr. Chabot is not binding as Mr. Tucker intentionally failed to sign the document. "An essential element to the formulation of any *Page 6 
true contract is an intent to contract. Read Lundy, Inc. v. WashingtonTrust Co. of Westerly, 840 A.2d 1099, 1102 (R.I. 2004), citingBailey v. West, 105 R.I. 61, 66, 249 A.2d 414, 417 (1969).
Mr. Tucker failed to establish a breach of the contract by Mr. Chabot.
Fraud
Mr. Tucker has fused together claims of fraud and breach of the covenant of good faith. However, the claims are quite different, and hence the Court will treat them separately. In order to establish fraud, Mr. Tucker was required to establish certain elements at trial:
 To establish a prima facie damages claim in a fraud case, `the plaintiff' must prove that the defendant "made a false representation intending thereby to induce plaintiff to rely thereon" and that the plaintiff justifiably relied thereon" to his or her damage." Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003) (quoting Stebbins v. Wells, 766 A.2d 369, 372 (R.I. 2001)). There is no evidence in this record demonstrating that Robinson made any false representations to plaintiff. . . . We decline to require Robinson to defend against an allegation of fraud based on a rebuttable presumption, in the absence of affirmative, intentional misrepresentations that plaintiff relied upon to his detriment. Bitting v. Gray, 897 A.2d 25, 34 (R.I. 2006).
Mr. Tucker failed to establish any false representation made by Mr. Chabot, either intentionally or negligently. Mr. Tucker even understood that Mr. Chabot did not own the property. Mr. Chabot subleased the property to Mr. Tucker with authority to do so. He did not authorize the extensive repairs made by Mr. Tucker. Mr. Chabot made significant repairs to the leasehold at his own expense. Moreover, the relationship was quite specific and written. Mr. Tucker could lease the property, and had an option to purchase which he never exercised. *Page 7 
Mr. Tucker claims that Mr. Chabot misrepresented the truth in several ways. He claims Mr. Chabot never intended to convey the property to Mr. Tucker. However, from the face of the two lease/option agreements, Mr. Chabot did not profit from continuing to own the property. While he derived some income from Mr. Tucker's payments, those payments were unlikely to ever cover the monthly costs for continuing to own the property. Moreover, as Mr. Tucker never elected to purchase the property, such a misrepresentation (if any was made) was never relied upon. A plaintiff must establish that he justifiably relied on the false representation. Kooloian v. Suburban Land Co., 873 A.2d 95, 99 (R.I. 2005). Mr. Tucker failed to establish this element.
Mr. Tucker also claims that Mr. Chabot committed a misrepresentation by his failing to hold the option monies segregated as a credit for Mr. Tucker's option to purchase. The written agreement between the parties does not require a segregated account,[4] simply that the funds would be credited to the option. Again, Mr. Tucker did not attempt to purchase the property.[5]
While Mr. Chabot's practice of acquiring interests in property from those who face the grim prospect of foreclosure, and then subleasing that property to others may be distasteful, his dealings with Mr. Tucker were not fraudulent. In this instance, Mr. Tucker was allowed to live in a four-bedroom home in a comfortable residential area at a *Page 8 
modest cost. Obviously, the relationship grew adversarial, particularly when Mr. Tucker stopped making monthly rental payments. Yet, Mr. Tucker understood the relationship between the parties from the outset, and executed an extensive agreement. He also understood that Mr. Tucker did not even own the property at the outset.
Breach of the Covenant of Good faith
Having failed to find a misrepresentation or reliance sufficient to constitute fraud, the Court is unable to extrapolate a breach of the covenant of good faith. In this relationship, each of the parties knew what they were dealing with, and the important provisions of the agreement (who had possession, how long, how much money would be paid, etc.).[6] As our Supreme Court has held
 We are cognizant that Rhode Island law requires that virtually every contract contain an implied covenant of good faith and fair dealing between the parties. However, this requirement only applies after a binding contract is formed. Since the promises of both parties to this action were illusory, a contract never came into existence and no duty of good faith and fair dealing arose on the seller's part to execute the purchase-and-sale agreement. Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342
(R.I. 1996). Citations omitted.
Mr. Tucker, an educated businessman, came to the bargaining table fully aware of the relationship, and proceeded at substantial risk (as did Mr. Chabot). Mr. Tucker accepted the agreement although it was not completely satisfactory to him, and is quick to assert that Mr. Chabot should be held to the obligations of a second contract — the *Page 9 
contract which Mr. Tucker never signed and then ignored. Mr. Tucker seems to request that the Court reconstruct the contracts. "It is not the function of the court to rewrite a contract according to its notions of fairness." Estate of Meller v. Adolf Meller Co., 554 A.2d 648, 653
(R.I. 1989).
The option payments
During the sublease, Mr. Tucker was paying $1500 per months in option payments. From September 1, 2005 up to August 2006, he paid Mr. Chabot a total of $18,000 in option payments. The lease agreement contains written option rights, but does not say whether those funds are refundable or nonrefundable. The option does not say whether the payments should be credited to a purchase price. It does, however, use the word "deposit," implying that they are refundable.
In a prior proceeding before another justice, this Court found that the funds which Mr. Tucker paid toward the option should be credited to his lease payments due. (Superior Court transcript of January 26, 2007, pages 10-17.) As Mr. Chabot drafted the lease/option agreements, and did so as a part of his regular business dealings, ambiguities in the agreements, which cannot be rectified on the face of the document, should be construed against him, the drafter. Monahan v. Girouard,911 A.2d 666 (R.I. 2006), Employers Mutual Casualty Co. v. Pires,723 A.2d 295, 298 (R.I. 1999). It is appropriate to apply all option payments made to Mr. Chabot to Mr. Tucker's indebtedness for lease payments due. *Page 10 
Damages
Mr. Tucker failed to pay $19,500 in lease payments to Mr. Chabot as set forth above. Per the agreement, Mr. Tucker also owes 13 months of late charges at $20 per month for a total of $260. Mr. Tucker paid $18,000 in option payments which should be credited in his favor. Therefore, judgment is granted to Mr. Chabot on the complaint (the eviction count) for a total of $1760. plus interests and costs. Mr. Chabot is not awarded possession.
The Court awards no compensatory damages or punitive damages to Mr. Tucker.
 CONCLUSION
Judgment is awarded to the plaintiff on the complaint with damages of $1760 plus interest and costs. Judgment is award to Mr. Chabot on all claims set forth in the counterclaim. No additional damages, interest or costs are awarded on the counterclaim. Possession of the premises is not awarded.
[1] While Mr. Chabot intended to make a profit, the lease payments due from Mr. Tucker were less than the payments which Mr. Chabot was to pay Mr. Pashos. Apparently, Mr. Chabot anticipated profiting from sales of the properties.
[2] Mr. Tucker was advised by at least two judges to seek the assistance of counsel, but insisted on representing himself throughout these proceedings.
[3] Mr. Tucker called Mr. Pashos as a witness. Mr. Pashos testified that he leased Mr. Chabot some seven properties in the hope that he would `short sell' them, or sell them promptly for a discounted price. Mr. Pashos also gave Mr. Chabot permission to deal with creditors who were threatening to foreclose on the properties.
[4] While realtors may be required to hold money in segregated accounts, Mr. Chabot made no such representation to Mr. Tucker. The Court is cognizant that the Department of Business Regulation, which regulates various real estate professionals, has commenced disciplinary proceedings. See In the Matter of Peter Chabot, d/b/aSalebyownerfinance, LLC, Department of Business Regulation case No. DBR. 04-L-0018.
[5] Mr. Tucker argued that Mr. Chabot's option to purchase from Mr. Pashos expired at the end of 2006, so if Mr. Tucker exercised his option to purchase thereafter, Mr. Chabot could not have conveyed. This argument ignores the most obvious facts: First, Mr. Tucker's option (in the only agreement signed by each party) expired on August 31, 2006. Second, Mr. Tucker knew that Mr. Pashos was the owner but that Mr. Chabot continued to deal with him. Third, Mr. Tucker never exercised his option, and given his liens and inability to pay his rent when due, would have been hard-pressed to purchase the property during this time.
[6]
 In a recent case, our high court affirmed a finding of a violation of good faith where the seller failed to disclose he did not own the property. The buyer was therefore entitled to recover not only the deposit, but other expenses incurred. Kooloian v. Suburban Land Co., 873 A.2d 95 (R.I. 2005). That case is easily distinguished from the case at bar where Mr. Chabot disclosed his contingent interest and the buyer never attempted to purchase.